. (No. 19811.

THE LAKE SHORE COUNTRY CLUB, Appellee, *vs.* HORACE
L. BRAND *et al.* Appellants.

*Opinion filed April 17, 1930—Rehearing denied June 6, 1930.*

Dunn and DeYoung, JJ., dissenting.

Deneen, Healy & Lee, and Litsinger, Healy & Reid, (John H. S. Lee, Daniel M. Healy, and Thomas C. McConnell, of counsel,) for appellants.

Henry Russell Platt, Julius Moses, Frederic Burnham, and Walter Bachrach, for appellee.

Mr. Justice Stone delivered the opinion of the court:

Appellee filed a bill in the superior court of Cook county seeking specific performance of an alleged contract for the sale of real estate arising out of an option contract entered into between it and appellants. A decree for specific per-

formance was rendered in accordance with the prayer of the bill and the cause comes here for review.

It is necessary that the substance of the lease and option be set out.

On February 1, 1909, Virgil M. Brand, (since deceased,) Horace L. Brand and Armin W. Brand, brothers, entered into a lease with appellee leasing to the latter a tract of approximately eighty acres in Cook county for purposes of a country club. The term of the lease began on the first day of April, 1909, and expires on the 31st day of March, 1939. On the same day the parties executed an option contract, which recites that in consideration of the execution and acceptance of the lease and a further consideration of one dollar in hand paid, the club (therein designated as party of the second part) is given the privilege and option of purchasing the leased premises at any time prior to the second day of December, 1922, for the sum of $160,000, or at any time after the first of December, 1922, and prior to the second of December, 1936, for $175,-000, on certain conditions hereinafter considered, which are by the option contract made conditions precedent to the rights of the club to purchase the lands described and to exercise the privilege and option. The lease consists of twenty-eight articles. The rental for the first five years is fixed at $5000 per year, to be paid in installments as provided in the lease, and thereafter periodically advanced, the rental for the last ten years being at $7000 per year. By it the lessee is to pay taxes and assessments against the property in the name of the lessors and to deliver to the lessors a duplicate receipt showing such payment. The lease also provides that all buildings should be kept in good condition and repair; that insurance policies on all buildings are to be taken out with responsible companies by the lessee at its expense and assigned and delivered to the Chicago Title and Trust Company, as trustee, for the benefit of the lessors, and a statement of such insurance from time

to time delivered to the lessors. The lessee also covenants against mechanics' liens and against waste by unnecessary removal or cutting of trees. It is also provided that in case of failure to pay taxes and assessments or to keep or maintain insurance as provided by the terms of the lease, or in case of waste, the lessors, their heirs or assigns, or any of them, at their option, "but without any obligation to do so and without prejudice to any other right of the lessors, * * * may pay such taxes * * * or redeem from any sale or forfeiture made because of non-payment thereof, * * * remove any or all liens and encumbrances or clouds on the premises or any building or improvement thereon, or expend whatever money may be necessary to repair or preserve the premises or property or to restore the same as herein agreed," any such payments to be re-paid by the lessee as additional rent. By article 7 it was provided that the lessee, "as a further special consideration for the execution of this lease on the part of the lessors," agreed that it would, prior to April 1, 1912, erect on the demised premises a club house of the cost and value of not less than $25,000, to consist of either one building or a cluster of connected buildings constituting club rooms, the same to be modern in equipment and complete with all the usual appliances for such a structure and suitable and adapted for the purposes for which the premises may be used. A copy of the general plans was by the terms of the lease to be submitted to the lessors before any contract for construction was let. The lessee agreed to procure from the contractors waivers of any liens which such contractor or others might claim on buildings on such premises, and that in case of abandonment of the building project by the lessee the lessors were privileged to complete the same at the expense and cost of the lessee. By the eighth article it was agreed that the lessee would deposit with Chicago Title and Trust Company, as trustee, a certificate of deposit for the sum of $25,000, made payable to the order of the trustee, to

be held by it for the benefit of the lessors, "primarily as security for the erection, construction and completion by the lessee in the manner and form and within the time heretofore stipulated of said club house agreed by the lessee to be erected by it upon the said premises, and secondarily as security for the performance and observance by the lessee of all other covenants, provisions and conditions of this lease." This article provided that so long as lessee was not in default it might receive the interest on the certificate of deposit. It was also provided that in case the buildings to be erected on the premises should exceed in cost the sum of $50,000, the lessee would add to the certificate of deposit a sum sufficient to increase that deposit to one-half the amount of the probable cost of such building. It was also provided that as soon as the lessee, in erecting such building, expended a sum of money sufficient to show the funds in the hands of the trustee sufficient to fully complete the building such funds may be paid out by the trustee for that purpose, any balance then remaining in the fund to be paid to the lessee, provided it shall not be in default of the performance or observance of any of the covenants of the lease and the building erected is free from liens. It was also in this article stipulated that if the lessee failed to complete and finish, in the manner and within the time stipulated, any building the erection of which had been begun or contracted for, then in that case the fund to be forfeited to the lessors, to be taken and held by them as their own property. This provision was stipulated "to be without prejudice, however, to any other limitation of the lessors under this lease, or otherwise, arising in consequence of such default on the part of the lessee." It was provided that at the end of the term the improvements were to pass to the lessors. The lease also contained the usual provisions with reference to forcible detainer, distress and lien for rent. By article 23 it is provided that no remedy reserved to the lessors by the lease "shall be considered exclusive of any other remedy, but the

same shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute." By article 24 it is provided that no waiver of any breach of covenant contained in the lease shall be construed to be a waiver of any other breach or any succeeding breach of the same covenant. By the twenty-seventh article the covenants are declared to be covenants running with the land and binding upon the parties, their heirs, successors and assigns. By the last article Frieda G. Brand, wife of Armin W. Brand, agrees that her right of dower, or any interest which she may have or receive, shall be held subject to conditions and provisions of the lease, and she agrees to be bound thereby though she assumes no responsibility thereunder. She also signed the lease. Virgil Brand and Horace Brand at the time of the execution of the lease and agreement were unmarried.

The option agreement by its first clause recites that the club (designated as party of the second part) shall have the privilege of purchasing the premises at the times and for the prices hereinbefore mentioned, and contains also the following provisions: "Provided, however, always, in either event, (1st) that at the time of said party of the second part's intended purchase and exercise of such privilege and option there shall be no default in the performance or observance of any of the terms, covenants or provisions of the said lease on the part of the lessee therein to be kept, performed or observed; (2d) that at the time of the said party of the second part's intended purchase and exercise of such privilege and option the said lease shall still be in full force and effect and not have been previously terminated; (3d) that the said party of the second part shall, not more than twelve months nor less than six months prior to the time of such intended purchase, have given to the then owner or owners of said lands and premises written notice of said party of the second part's election to purchase the same and of the time of such intended purchase and

exercise of such privilege and option; (4th) that at least ten days prior to the time of such intended purchase as designated in said written notice the said party of the second part shall have deposited with the Chicago Title and Trust Company (an Illinois corporation having its principal office in the city of Chicago aforesaid) the amount of the said purchase price, either one hundred and sixty thousand dollars ($160,000) or one hundred and seventy-five thousand ($175,000) dollars, (as may be required as aforesaid,) all in cash; and (5th) that in case the term of said lease shall have been determined prior to the second day of December, 1936, or in case the said party of the second part shall not have purchased the said lands and premises prior to the second day of December, 1936, then said privilege and option hereby granted shall be considered at an end and of no further force and effect; all of which said provisos (numbered, as aforesaid, 1st to 5th, both inclusive,) shall be conditions precedent to any right of the said party of the second part to purchase the said lands and premises and to exercise said privilege and option."

The second clause of the option agreement provides that within two months after receipt of the written notice from the second party of its election to purchase the premises, the first party will deliver a merchantable abstract under the conditions and provisions in that clause set out. The third clause of the option agreement provides that at the time designated for the purchase, "provided all the provisos and conditions aforesaid have been fully complied with, performed and fulfilled," the Chicago Title and Trust Company is to turn over the purchase money to the optioners and to deliver warranty deeds of the optioners to the optionee. This clause also provides that there shall then be paid over to the optionee any sums of money in its hands, so far as the same shall not be applicable or necessary to make good to the lessors or obviate any default on the part of the lessees or damage to the lessors occasioned thereby.

The only money the trustee was to hold under the lease was the $25,000 taken down by the lessees and the proceeds of insurance policies in case of fire. No policies were placed in the hands of the trustee and no fire occurred. The application of this clause was limited by its terms to the condition that all the provisos and conditions aforesaid have been complied with, and cannot be construed as giving a right to exercise the option in the absence of such compliance. It cannot, in any event, be said to take the place of all such compliance. It is also provided in this clause that its provision shall not "contravene, modify or impair any provision, covenant or condition of the said lease, but that the leasehold estate thereby created shall be considered merged in the fee only on the delivery to the said party of the second part of said warranty deed or deeds, and without prejudices to or impairment of any sum or right then or theretofore accrued to the said parties of the first part, or the lessors, at any time under said lease. Said party of the second part shall be entitled, at its option, to make use of and apply said funds so held by the said Chicago Title and Trust Company, or any part thereof, and not so applicable or required as aforesaid, as a part of the purchase price so to be deposited by the party of the second part as aforesaid." By the fourth clause time is made the essence of the agreement, and it is stipulated that if the optionee shall not complete the purchase prior to the second day of December, 1936, or in event of the failure or omission of the said party of the second part to observe and comply with any of the provisions or conditions of the option agreement, or in the event of the occurrence of any other act or thing prior to said second day of December, 1936, releasing the said parties of the first part, the agreement shall be considered terminated and at an end. By the fifth clause it is provided that on the termination of the lease by expiration, or for any reason, the option is at an end. By the sixth clause the stipulations of the option agreement are made binding

on the heirs, successors and assigns of the parties, and Frieda G. Brand in this clause agrees that her dower right, or whatever right she may have in the property, is to be bound by the terms of the agreement.

The bill alleges that on September 24, 1926, the club (hereinafter referred to as complainant) gave to Armin W. Brand, Horace L. Brand and Erna Brand Zeddies, the then owners of the premises, (hereinafter referred to as defendants,) a written notice of the complainant's election to purchase the premises. It is alleged that at the time of the giving of such notice there was no default in the performance or observance of any of the terms, covenants or provisions of the lease and that the lease was in full force and effect. It is also alleged that on September 29, 1926, the defendants gave notice to the complainant that it had made default in certain covenants of the lease therein specified and denied that the complainant had any lawful right of election to purchase the premises. The bill sets out the defaults which defendants claim existed at that time, which include failure to keep covenants of the lease as to building, payment of rentals, taxes, deposit of moneys, deposit of insurance policies, submit plans for building, procure waivers of liens, waste, use of premises, and other defaults.

As to the claim of the defendants that the complainant was in default of its covenant to erect a club house, the bill recites the provisions of the lease hereinbefore mentioned in that particular, and alleges that pursuant to the provisions of the lease it deposited with the Chicago Title and Trust Company a certificate of deposit for $25,000, and that it thereupon took up with the defendants negotiations seeking a modification or waiver of the provisions of the lease concerning the building contemplated on the leased premises, and that in June, 1909, the lessors agreed with the complainant to waive such provisions, and that in consideration of such waiver the complainant was to convey certain property to the Chicago Title and Trust Company,

as trustee, as security for the performance of the covenants of the club; that the form of the trust deed on the certain premises therein described was to be satisfactory to the attorneys for the lessors; that pursuant to such new agreement the lessors in August, 1909, directed the Chicago Title and Trust Company to return to the complainant the certificate of deposit, which it did. The bill also alleges that in order to procure the agreement of June, 1909, the complainant purchased from Horace L. Brand a tract of five acres and paid him in excess of $6000 therefor, it being understood at the time of such purchase that the same was made as a part of the consideration for the release of the complainant from the obligations to erect a club house, and that, relying on that agreement, the complainant erected a club house on adjoining land. The bill also recites that notwithstanding its numerous requests, attorneys for the lessors failed to draw up the trust deed to be deposited as security, though the complainant was anxious at all times so to do. The bill further alleges that after receipt of the notice of the defendants, in which the latter denied the right to exercise the option to purchase, the complainant, on or about November 18, 1926, deposited with the Chicago Title and Trust Company, as trustee, a trust deed drawn in due and proper form to afford the lessors ample security to an extent fully equal to that contemplated by the clause of the original lease providing for the erection of a club house, together with insurance policies on the buildings erected on the demised lands, which policies were assigned to said trustee for the benefit of the lessors, as provided in the lease, and that it delivered to the lessors a certificate of the county clerk showing the payment of taxes and a proposed agreement to be signed by them declaring void the provisions of the lease with reference to the erection of a club house. The bill charges that the failure to build the club house as required by the lease was not a default because of the agreement of June, 1909. The bill also alleges that there was

no default on the part of the complainant of any of the terms of the lease.

On June 26, 1928, during the hearing before the chancellor, complainant, on leave, amended paragraph 20 of the bill so as to allege that in 1910 the defendants also agreed with the complainant that the latter need not execute and deposit the proposed trust deed to be provided by the agreement of June, 1909, owing to the fact that the lessee had, by way of improvements, structures and buildings erected or being erected, given ample security to the lessors, and that the lessors abandoned the requirements of the lease with reference to the erection of the building or the deposit of $25,000 and waived all requirements with reference thereto or the compliance of the complainant therewith, as well as the agreement of June, 1909, and so notified complainant to that effect. The bill prays specific performance of the option contract.

All the defendants except Horace L. Brand filed an answer denying the allegations of the bill, setting up the Statute of Frauds as a defense, and alleging that the terms of the option contract were conditions precedent to the right of the complainant to purchase the property and that complainant was in default as to such conditions. Horace L. Brand filed a separate answer, alleging, in substance, the same. It appears that Horace L. Brand had deeded his interest in the demised premises to his daughter, Erna, now Erna Brand Zeddies, one of the defendants. On the death of Virgil Brand, which occurred shortly prior to September 1, 1926, Horace L. Brand became again interested in the premises to the extent of a one-sixth part thereof.

A hearing on the bill and answers was had in open court, where the following facts were developed from undisputed testimony: The complainant did not erect on the premises a club house as required by the conditions of the lease but erected the same across the public highway known as Sheridan road, east of the demised premises and on its own land.

It constructed a building referred to as the "caddy-house," with locker rooms, showers, repair rooms for golf clubs, office for the professional golf instructor, and an enclosed veranda or sun-room. Walks leading from this building extend under Sheridan road through a tunnel and connect with the club house premises. It is not contended that this building was such a club house as was required by the lease. All taxes and assessments on the premises were paid, but not all were paid in the names of the owners, as required by the lease, part being paid in the name of the club. No policies of insurance payable to Chicago Title and Trust Company, as trustee, were delivered to or deposited with it, as required by the lease, until after the complainant received notice from the defendants objecting to transfer of the property to complainant. No copy of general plans for buildings to be erected on the premises was submitted to the lessors, as required by the lease. Four private residences, not necessary to or a part of the golf course or club house, were built on the premises by individuals who occupy them as residences, the club receiving therefor as ground rent the sum of $500 for each building. No plans were submitted to the lessors regarding these buildings or deposit made covering one-half the estimated probable cost of them, as provided by the lease. The certificate of deposit for $25,000 was deposited as required by the lease, but was on August 13, 1909, taken down with the consent of the attorneys for the lessors. No agreement in writing modifying the lease as to building requirement was executed and no deeds of trust covering lands belonging to the club were executed and delivered to the Chicago Title and Trust Company as was to be provided by such proposed agreement, until after notice was served by defendants objecting to the transfer of the premises. As to these facts there is no contradiction in the testimony. That these were all defaults is not denied save as to two, which are, the failure on the part of the appellee to erect a club house of the

kind and character specified in the lease, and its failure to keep on deposit with the Chicago Title and Trust Company the sum of $25,000, as required in the lease.

The position taken by the complainant, as alleged in its amended bill, is that the lessors, after the execution of the lease, agreed, first, that there should be no club house erected on the premises; that the certificate of deposit for $25,000 might be taken down, and that as consideration for this agreement and as security to the lessors a trust deed covering certain properties purchased by the club, including a five-acre tract purchased from Horace L. Brand, was to be executed and delivered to the Chicago Title and Trust Company, as trustee, for the benefit of the lessors, to take the place of the $25,000 certificate of deposit and the security that would arise from the construction of a club house on the premises. The second agreement which it alleges was made, was, that in 1910 the lessors agreed to waive the provisions of the agreement requiring the trust deed because of the amount of improvements which the complainant had then put on the premises. It is not contended that the evidence shows that the trust deed covering property owned by the club was executed and deposited with the Chicago Title and Trust Company for the benefit of the lessors prior to service of notice that the complainant wished to exercise its option to purchase.

The evidence as to what occurred in reference to the claimed agreement to amend the lease regarding the construction of the club house contains but little dispute, though counsel do not agree as to the legal conclusions to be drawn from the facts developed. As a result of the efforts on the part of the complainant to amend the lease regarding the club house, Horace L. Brand on May 3, 1909, wrote a letter to Messrs. Rosenthal & Hamill, attorneys for the lessors, referring to the request of the complainant to be released from the building requirements of the lease, and stating that he had thought the matter over and had talked

to Virgil Brand and that the latter was willing to leave it to him. The letter then states: "Now, I will release the club from the obligation as requested by them provided I get better security than I now have from the club." His letter indicated that he desired deeds placed in escrow in the place of the building requirements, such deeds to cover, among other tracts, the five-acre tract of his own, which he would sell to the club for $1500 per acre. The only evidence that Virgil Brand knew anything about these negotiations appears in this letter. Horace Brand does not there state he talked to Armin Brand about it, and Armin testified that he did not consent to any such arrangement.

On June 14, 1909, the attorneys for the lessors wrote a letter to the secretary of the complainant club stating that Horace L. Brand, one of the lessors, was at that time in the office; that the writer had had a conference with him regarding the substitution of other security for the provisions to erect a club house. The letter states "Mr. Brand is willing," and then sets out a number of provisions which Horace L. Brand evidently dictated. They were that the club convey by deed of trust to the Chicago Title and Trust Company certain pieces of property,—including Horace L. Brand's five-acre tract which the club was to purchase from him,—to secure the payment by the club of the rental from time to time falling due on the lease and the performance and observance of all covenants, such trust deed to be drawn in a form satisfactory to the lessors' attorneys; that in case of default under the lease a sale might be had of the property conveyed by deed of trust, or so much thereof as might be necessary under the conditions set out in the letter. It was also stated in this letter that nothing contained in the proposed trust deed should be taken as a modification or waiver of any provision or covenant of the lease except solely the covenant requiring the lessee to construct a club house on the premises of a value of not less than $25,000 and all remedies under the lease to be cumulative and not

exclusive of one another. This letter closes with the following clause: "It is to be distinctly understood between all the parties that no provision whatever of the lease of February 1, 1909, is to be considered waived, modified or in any way impaired until formal papers as approved by the lessors' attorneys are duly executed by the various parties in interest." It appears that this letter met with the approval of complainant, but it also appears that no trust deed was ever prepared either by counsel for complainant or by counsel for the lessors and no agreement waiving the original terms of the lease was ever signed by the lessors. The evidence shows that Horace wrote to his brother Armin asking for a power of attorney to execute such an agreement amending the lease but received no reply from Armin concerning the matter. It is conceded that no power of attorney was issued to him.

Counsel for the complainant argue that Virgil Brand and Armin Brand were bound by the transactions of Horace. While the evidence discloses that detail matters in the transactions between the lessors and lessee in the making of the lease were conducted by Horace, yet the lease was signed by all the lessors and was first approved by them. It is also in evidence that Horace collected some rents, but there is no evidence showing that he had any power, as agent of Virgil or Armin Brand, to bind them in matters relating to the amendment of the lease or waiver of the terms thereof. It is also argued that the attorneys for the lessors had authority to complete negotiations of this kind, and it was their duty to draw up the trust deed but that they failed so to do. The record does not justify this conclusion. One of the then attorneys for the lessors, Mr. Lessing Rosenthal, testified in this case. His testimony shows that his authority was that of an attorney at law for the lessors. While he states that he thought that the matter of amending the building provisions of the lease and the taking down of the certificate of deposit was satisfactory to all the less-

ors, he also testified that he did not recall any particular conversation with any of the lessors other than Horace showing an agreement therewith. He testified that he did not consider it his duty to draw the trust deed. Such a duty rested primarily on appellee. Armin Brand did not consent to any such change in the lease. As to the second alleged agreement, by which it is claimed the trust deed on club property was waived, the evidence of the complainant is that the attorney for the lessors told a representative of the club that it was satisfactory to the lessors that no such deeds be put up, owing to the improvement made on the premises. The attorney for the lessors does not corroborate this evidence literally but testifies that he said he did not consider the whole thing of any importance in view of the money the club had spent and the security up by reason of the lease. The evidence is not sufficient to show an agreement on the part of the lessors either as to waiver of the provision of the lease in reference to the building or concerning the trust deeds. The proposal made by Horace specifically stated that the lease was to be amended only by "formal papers."

It is also argued that Horace was the agent of the other lessors to the extent of permitting him to bind them by admissions that he might make, by knowledge which he gained in the course of negotiations or by notices received. While Virgil, who died before the filing of this bill, had signified to counsel for the lessors that Horace was authorized to act for him in the matter of negotiating for the lease and later in the sale of a right of way for a highway over these premises, there is no evidence of unlimited authority on his part to represent his brothers. One of the witnesses for complainant testified that in a conversation with Armin Brand after notice of the lessors that they would not convey the property, Armin stated that he knew little about the matter because Horace was looking after it. This, however, was directly contradicted by Armin Brand.

Agency may be proved by the relation of the parties and the circumstances under which the transactions take place. (*Faber-Musser Co.* v. *Dee Clay Co.* 291 Ill. 240; *Union Stock Yards Co.* v. *Mallory*, 157 id. 554.) Yet the record does not support the claim that Horace Brand had authority to make contracts for Armin or Virgil Brand or waive or modify the provisions of the lease. We are of the opinion from examination of the evidence that no agreement was shown to have been entered into by the lessors Armin and Virgil Brand to the effect that the covenants of the lease with reference to the building of the club house on the demised premises should be waived, nor were the provisions with reference to depositing the certificate of deposit for $25,000 agreed to be waived by them.

Counsel for complainant, however, earnestly argue that, notwithstanding this, all of the defendants knew that the club house was not built on the premises, and that they also knew of the other defaults in the conditions of the lease, and must be held to have waived the same. Both Horace and Armin Brand testified that although they knew that the club house was not built on the premises they did not know that the certificate of deposit had been taken down, or that the insurance policies had not been assigned to the trustee, or that the taxes had not been at all times paid in the names of the lessors. Armin Brand testified, also, that although he once had gone around the golf course at a time when, as evidence shows, the four cottages were built on the premises, he did not know until after the filing of the bill that these residences were on the demised premises. These residences, owned by private parties, were erected among trees near the boundary line of the demised premises.

Counsel for complainant also urge that since the club has put many thousands of dollars into improvements of the leased premises it would be inequitable to forfeit the option contract; that equity abhors a forfeiture. This brings us to a consideration of the option contract, the

first clause of which contains five conditions which the contract stipulates shall be conditions precedent to any right of the club to purchase the lands demised and to exercise such privilege and option. The first condition is, that "at the time of said party of the second part's intended purchase and exercise of such privilege and option there shall be no default in the performance or observance of any of the terms, covenants or provisions of the said lease on the part of the lessee herein to be kept, performed or observed." Appellee contends that this is to be construed as meaning that at the time of the delivery of the deed called for by the exercise of the option there shall be no default in the performance or observance of any of terms of the lease; that, notwithstanding the existence of defaults, appellee had a right under this provision of the option contract to elect to purchase the property and by such election to convert the option contract into a contract for the purchase and sale of real estate, and that if there be no default in the covenants of the lease at the time fixed in the notice of election for the passing of the deeds the conditions of the option contract are met, and that to hold otherwise would be to declare a forfeiture of the option contract.

An option contract is unilateral. Under it the optionee has a right to purchase upon the terms and under the conditions therein named. He is not, however, bound to purchase. Because but one party is bound thereby and the other is not, courts will exercise their discretion with great care in determining whether such a unilateral contract has been converted into a bilateral contract. (*Crandall* v. *Willig,* 166 Ill. 233; *Estes* v. *Furlong,* 59 id. 298.) If conditions precedent to the right to convert a unilateral contract into a bilateral one are not met the unilateral contract does not become bilateral. (*Barnett* v. *Meisterling,* 327 Ill. 564; *Bostwick* v. *Hess,* 80 id. 138.) An option contract is not a contract of sale within any definition of the term, and at best but gives to the option holder a right to purchase upon

the terms and conditions, if any, specified in the option agreement. In order to avail himself of the right the optionee must comply with the conditions set out in the option contract. (*Bostwick* v. *Hess, supra;* 1 Warvelle on Vendors and Purchasers,—2d ed.—sec. 175; *Jerome* v. *Setzer,* 175 N. C. 391, 95 S. E. 515.) An option contract does not come within the equitable rule against forfeitures. The question of declaring a forfeiture is not involved. An option contract gives to the optionee a right under the named conditions. If those conditions are not met the optionee does not acquire the right. Such a situation involves none of the elements of a forfeiture. It deprives no party of any right and abrogates no contract, but, on the other hand, is but the enforcement of the contract made by the parties. (*McCauley* v. *Coe,* 150 Ill. 311; *Nelson* v. *Stephens,* 107 Wis. 136, 82 N. W. 163; *Briles* v. *Paulson,* 139 Pac. 169.) A court of equity cannot relieve the optionee from the effect of his failure to comply with the conditions on which he has been granted the privilege of buying. This would make a new contract for the parties and compel the owner to sell when he had not agreed to do so. The optionee must perform all conditions precedent to his right to purchase not waived by the optionor. In this respect the denial of an option to purchase property differs from the forfeiture of property rights already acquired under a bilateral contract. (James on Option Contracts, (1916) sec. 862.) Therefore, unless the appellee has met the conditions of the option contract or the conditions have been waived it is not entitled to exercise the option.

We cannot agree with the position taken by counsel for appellee that the first condition of the option contract,—that is, the language "that at the time of said party of the second part's intended purchase and exercise of such privilege and option,"—relates to the time of the passing of the deed, at which no default in performance of the terms of the lease shall exist. Clearly this language could not be so construed.

These conditions in the option contract were presumably made for the benefit of the optionors. It would be of no benefit to them, when by notice of election to purchase the option contract had been converted into a contract for purchase and sale, to have the defaults in the lease then corrected, for, the optionors then being bound to sell and the optionee bound to buy, it becomes no longer of interest or concern to the optionors whether the covenants of the lease (other than the payment of accrued rent, not involved here,) be met. It seems clear that by this language of the option contract it was intended to stipulate not only that at the time of the passage of deeds, as indicated by the first part of that language, but also at the time of the exercise of the privilege and option, there shall be no default. By "exercise of such privilege and option" the parties plainly referred to the time of election. The right to elect under an option contract is the right to convert an option into a binding promise, and an election is the act which so converts that unilateral contract into a bilateral one. The right of the optionee to elect continues for the full period of time unless prior to its expiration he surrenders or fails to comply with the option. The right of an election in an optionee is the right to bring the parties into an agreement binding upon each. Clearly, therefore, the exercise of the privilege and option is the act which converts the option into a binding promise. The sufficiency of the election must be determined at the time of the exercise of such privilege and option and by the terms of the option contract itself. (James on Option Contracts, sec. 839.)

Counsel for appellee argue that their construction of this language of the option contract is sustained by the second, third and fourth conditions of the first clause. The second condition is, as we have seen, that the right to purchase the property depends on the condition "that at the time of the said party of the second part's intended purchase and exercise of such privilege and option the lease shall be still

in full force and effect and had not been previously terminated." The third condition is, that the optionee, not more than twelve months or less than six months prior to the time "of such intended purchase," have given to the owner of the land written notice of its election to purchase; and the fourth condition is, that the optionee shall, within ten days prior to the time of such intended purchase, deposit the amount of the purchase money. There is nothing in the three conditions just mentioned which lends strength to the argument of counsel concerning the construction of the language of the first condition. The second condition depends upon whether the lease is then in force or has been terminated. This condition, were the lease terminated by agreement, would have application wholly independent of the first condition but not exclusive of it. The third and fourth conditions are likewise independent of the first. They, however, are all conditions precedent to the right of the optionee to purchase the lands demised. We are of the opinion that as the appellee was in default, in the manner hereinbefore specified, at the time it gave notice of its election to purchase, it has not met the conditions precedent to its right to exercise the option. No cases cited by appellee lay down a different rule.

Counsel for appellee earnestly argue, however, that the defaults in the lease were waived, and this being so, a waiver of default in the lease is a waiver of a right to deny the option, and that since the lease has not been terminated the right to exercise the option was not affected. It has long been the rule that where waiver is alleged the burden rests upon the one alleging such waiver to prove that at the time thereof the person waiving had knowledge of all the material facts. (*Depue* v. *Cordell,* 327 Ill. 254; *Boardman* v. *Bubert,* 325 id. 38; *Ferrero* v. *Knights of Security,* 309 id. 476.) We are of the opinion that particularly as to Armin and Virgil Brand the evidence shows that these lessors did not have knowledge or notice of the defaults of the

appellee, either as to the taking down of the certificate of deposit, the failure to assign and deposit insurance policies, the building of the cottages on the premises, or the failure to pay the taxes in the name of the lessors. So far as Horace Brand is concerned, the evidence shows that he had knowledge of the desire of appellee to take down the certificate of deposit and to be relieved from the building requirement. He evidently capitalized on this desire to procure the sale to the club of his tract of land, and were this the only default in the lease and Horace L. Brand the only defendant the question of waiver of compliance with the lease would have a very different aspect. There is, however, no evidence showing that Armin and Virgil Brand knew of the sale of land by Horace to the club. Virgil Brand was dead, and Armin testified that he knew nothing of it or of Horace's ownership of any such land in that neighborhood. The record does not show facts sufficient to establish a waiver of these defaults.

It is also contended that since the lease provided sixty days after notice as to some defaults and ninety days as to others in which to correct the same, and appellee received no notice of any such complaints, appellants are not entitled to take advantage of such defaults in this proceeding. There was no obligation on the part of the lessors to notify the lessee of a default in order to rely upon such default as a defense to a suit for specific performance, though such would be necessary if they were seeking a forfeiture of the lease. There is no obligation on the part of an optionor to notify the optionee of his defaults in the conditions of the option contract, for the reason that the optionor is required to take no action whatever about it. His right at the time the optionee elects to purchase is merely that of a party to a contract to have that contract enforced, and when, as here, a condition of the option contract is that the covenants of a certain lease are to be kept, the optionor has the right to refuse to enter into a contract of sale on

the ground of default in any covenant of the lease the breach of which he has not waived. This is of the essence of an option contract. The failure to meet the conditions of such a contract defeats the right to exercise the option. The effect of a breach of condition is to prevent the party failing to perform from acquiring a right but subjects him to no liability. (Williston on Contracts, p. 1281.) In this case the conditions of that contract were not met, but there has been no breach of the option contract for the reason that until the conditions are met there is no obligation to be breached. It was at all times optional with the optionee to fulfill the conditions precedent and take the benefit of the contract or fail to meet such conditions and lose the benefit of it. It was not bound by the option contract to do anything. The optionors were bound only to hold themselves ready to convey when the conditions of the option contract were met. In a case such as this forfeiture is not involved.

Counsel for appellee urge, however, that the appellants here are estopped by the recognition of the option contract by Horace Brand in 1923. The facts relative thereto are as follows: Horace, who then had no interest in the property, submitted to the appellee a proposition to purchase the property at that time. Some correspondence was had between him and the club but nothing was agreed upon. There is no evidence other than these letters that Virgil, Armin Brand or Mrs. Zeddies knew anything about this proposal of Horace. Armin testified he knew nothing of it. In his first letter Horace stated to appellee that he thought he could persuade his brothers to sell at a price that would be saving to appellee owing to increase in rents. He again wrote the club on April 21, 1923, saying: "I am now ready to make you a proposition so that your club can purchase the land now used as a golf links," and asking for an appointment. Later he again wrote, stating: "I am authorized by the owners of the eighty acres now under

lease to your club to offer the eighty acres to you for sale for the sum of $157,200, cash." It is argued that these admissions by Horace of the existence of the option were binding on Armin and Virgil because they were co-obligors, and that the presumption is that as co-obligor Horace acted with authority in the absence of a denial of authority. Counsel cite in support of this contention *Schwartz* v. *Mc-Quaid*, 214 Ill. 357. In that case it was held that under the facts in that case, and in the absence of evidence to the contrary, it will be presumed that a lease made by one of several tenants in common was made with the knowledge and consent of all. In the case before us the agency of Horace Brand is disputed, and if any such presumption existed it was rebutted by direct testimony. At the time this offer was made Horace had no interest in the property, and there is no evidence that he at that time was collecting the rent. His letter indicating that he was representing his brothers was not binding on them. The rule regarding acts of a joint obligor has no application here. Before any statement on the part of an agent is binding on his principal it must be shown that such agent was acting within the scope of his authority. His agency cannot be proved by his own statements. (*O'Donnell* v. *Henley*, 327 Ill. 406; *City of Chicago* v. *Jewish Relief Society*, 323 id. 389; *Lowden* v. *Wilson*, 233 id. 340.) No representations were made to the appellee by these letters of Horace that would in any way change the position of the appellee, and no basis of estoppel exists.

Counsel for appellee argue, however, that these letters indicated a recognition of the option contract after date of claimed default in the lease. There is no evidence that the appellants at any time refused to recognize the option contract, and the offer of Horace, though he were shown to be the agent of Virgil and Armin in 1923, could not amount to a waiver on the part of the appellants of the covenants of the lease unless they knew at that time of the breaches of

such covenants. Moreover, the offer of Horace, though his letters refer to the option, was to create a new contract independent of the then existing option and for a different consideration.

Appellee argues most earnestly that it is unreasonable to permit the appellants to sit by for fourteen years, notwithstanding the defaults under the lease, and then urge such defaults to defeat the option. A complete answer to this argument, however, is that such is the contract of the parties. Where conditions are raised, not by the contract of the parties but by circumstances, courts may deal with them in such a manner as to accomplish justice and avoid hardships. But, as is well said by Williston in his work on Contracts (p. 1289): "But an express condition depends for its validity on the manifested will of the parties. It has the same sanctity as the promise itself. Though the court may regret the harshness of such a condition as it may regret the harshness of a promise, it must nevertheless enforce the will of the parties unless to do so will violate public policy." To the argument of counsel that appellants should not be permitted to defeat the option at this late day, it may likewise be said that by the same token it would not be reasonable to permit appellee to disregard for fourteen years the terms of the lease made conditions precedent to the exercise of its right under the option contract and then permit it to exercise its election and convert the option contract into a contract of sale without having corrected such defaults or procured the waiver of them. The difference in the situations of the parties under the option contract lies in the fact that the duty to act rested on the optionee if it would prepare itself to take the benefit of the option, and not on the optionors. To now relieve it of the effect of such defaults would be to permit it to speculate for all those years on the rise or fall in the value of the land, and upon a rise therein take the property without meeting the conditions made for the benefit of the optionors.

The evidence shows that the club expended by far the major portion of its cash outlay in the improvement of property of its own and not the leased premises. On the leased premises the funds were used to construct a caddy-house and locker rooms, which the evidence of appellee shows to have cost more than $25,000 and which the evidence of the appellants indicates could be built for about $18,000, and the preparation of the golf course. It was contemplated by the lease that there should be built on the leased premises a club house of the value of at least $25,000, which was to remain on the premises at the expiration of the lease if the option to purchase was not exercised. The four cottages built on the leased premises were built by individuals and were not for club purposes but for private homes—a use not contemplated under the lease. These cottages, costing, as the evidence shows, from $20,000 to $30,000 each, were put on the premises without the knowledge of the appellants or their permission so to use the land. Appellants, however, stated in the record in the lower court that they were willing that these cottages should be removed by the owners at any time up to the expiration of the lease. The damages to appellee which are earnestly urged here consist, therefore, largely in what it put into the caddy-house and locker rooms and the golf course, all of which were to remain on the premises after the expiration of the lease, and the loss of the opportunity to buy the demised premises, which, the evidence shows, have increased substantially in value. These results arise, however, not from the forfeiture of a contract but from the enforcement of the option contract.

The decree of the superior court of Cook county is reversed and the cause is remanded, with directions to enter a decree dismissing the bill of complaint.

*Reversed and remanded, with directions.*

DUNN and DEYOUNG, JJ., dissenting.