******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., dissenting. I agree with the majority that an optionee must express his election to accept an option in strict accordance with its terms and conditions. I do not agree, however, that there should be a different compliance standard applied to other conditions precedent to the optionor's duty to perform. Many option contracts contain conditions relating to the form of acceptance, such as requiring notice in writing within a specified period of time. Other options provide additional conditions that the optionee must satisfy prior to exercising the option, such as compliance with the terms of a lease. All of these conditions are, in effect, part of the performance that the optionee must complete in order to accept the offer. In my view, if strict compliance applies to some conditions, it should apply to all conditions, both from a commonsense perspective and in light of this court's decision in *Brauer* v. *Freccia*, 159 Conn. 289, 268 A.2d 645 (1970), which requires an optionee to fully comply with all "named conditions . . . ." Id., 294. This is especially true when, as in the present case, the option is part of a commercial transaction between sophisticated parties. I finally observe that the application of the doctrine of substantial performance to unilateral contracts is inappropriate because it protects rights that optionees do not yet possess. Accordingly, I respectfully dissent.

I begin with the applicable law regarding option contracts and conditions precedent. "A unilateral contract is one in which the offeror invites acceptance of his promise not by a reciprocal promise, but by *performance*. . . . [I]n such a contract, there is no mutuality of obligation between the parties. See generally 1 E. Farnsworth, [Farnsworth on] Contracts (1990) § 3.24 [pp. 290–91] . . . ." (Citation omitted; emphasis added.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 13 n.4, 662 A.2d 89 (1995). Option contracts are a type of unilateral contract. See, e.g., *Williams* v. *Lilley*, 67 Conn. 50, 56, 34 A. 765 (1895). An option to purchase real estate, therefore, is "a continuing offer to sell, irrevocable until the expiration of the time period fixed by agreement of the parties, which creates in the option holder the power to form a binding contract by accepting the offer." (Internal quotation marks omitted.) *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 409, 973 A.2d 1229 (2009). The optionee may accept this offer and form a binding, bilateral contract of sale through performance "according to the *precise* terms and conditions of the contract." (Emphasis added; internal quotation marks omitted.) *Pigeon* v. *Hatheway*, 156 Conn. 175, 183, 239 A.2d 523 (1968).

Thus, "[t]he offeror's duty of performance under any option contract so created is conditional on completion

or tender of the invited performance *in accordance with the terms of the offer*." (Emphasis added.) 1 Restatement (Second), Contracts § 45 (2), p. 118 (1981).[1] Put another way, in order to convert the unilateral option contract into a binding, bilateral contract for sale, the optionee must "[accept] the offer according to its terms . . . [by] perform[ing] the conditions contained in the offer." *Buchannon* v. *Billings*, 127 Vt. 69, 74, 238 A.2d 638 (1968); see also *Brauer* v. *Freccia*, supra, 159 Conn. 293–94 ("[The] language [of the option] clearly indicates that the [lessor's] duty to comply with the terms of the option was conditioned [on] the [lessees'] punctual performance of their obligations under the lease. *A* [*lessee*] *who fails to meet the named conditions of his lease defeats his right to rely on it when he makes an effort to purchase the property pursuant to the option in the lease.*" [Emphasis added.]).[2]

I see no logical reason to apply different compliance standards to different conditions precedent in an option contract when determining whether a party has complied with the conditions of the contract.[3] Option contracts may contain numerous conditions precedent. For example, some option contracts provide that the optionee must communicate his election to accept the option in a certain way, such as providing written notice within a specified period of time.[4] Other option contracts, such as the one at issue in the present case, impose additional conditions precedent, such as compliance with the terms of a lease.[5] At times, a condition precedent might be outside the control of the parties.[6] Often, however, the condition is entirely within the control of the optionee, such as ensuring that the terms of a lease are satisfied. Because conditions precedent within the control of the optionee must be satisfied by the optionee, the satisfaction of these conditions is the "performance" that constitutes the "acceptance" of the offer so as to trigger the optionor's obligation to perform.

Our precedent does not distinguish between various types of conditions precedent.[7] In *Brauer* v. *Freccia*, supra, 159 Conn. 291, the lessees and the lessor entered into a lease on August 28, 1962, providing that, "if the [l]essees shall have duly and punctually fulfilled all of the provisions, agreements, covenants and conditions of this lease . . . the [l]essor, on the receipt of written notice from the [l]essees stating that the [l]essees elect to purchase the leased premises . . . will convey the leased premises to the lessees on and subject to [certain] conditions [including the following] . . . . It is agreed that this option to purchase may be exercised only by the [l]essees giving the written notice to the [l]essor above provided for at least sixty . . . days prior to the expiration of this lease or any renewal thereof." (Internal quotation marks omitted.) Id., 291 n.1. "As of April 1, 1967, [the lessees] had failed to make seven monthly payments of $350 each, causing

an arrearage of $2450. As of the date of the trial they had failed to make a further monthly payment of $350 thereby causing a total arrearage of $2800." Id., 292. On April 18, 1967, the lessees provided written notice to the lessor, "stating that they wished to purchase the property under the terms of the option." Id. The lessor then "caused a notice to quit to be served on the [lessees], claiming nonpayment of rent." Id.

This court determined that "the language [of the option was] lucid and unambiguous in stating that the [lessor] . . . was obligated under the option clause 'if the [l]essees shall have duly and punctually fulfilled all the provisions, agreements, covenants and conditions of [the] lease.' This language clearly indicate[d] that the [lessor's] duty to comply with the terms of the option was conditioned [on] the [lessees'] punctual performance of their obligations under the lease. A [lessee] who fails to meet the *named conditions* of his lease defeats his right to rely on it when he makes an effort to purchase the property pursuant to the option in the lease. *Lake Shore Country Club* v. *Brand*, 339 Ill. 504, 522, 171 N.E. 494 [1930]." (Emphasis added.) *Brauer* v. *Freccia*, supra, 159 Conn. 293–94. Accordingly, the court concluded that, because "the [lessees] had failed to perform their obligations under the lease, the right to enforce the option to purchase was not in existence and the [lessor was] under no obligation to convey the property." Id., 294.

The majority posits that the lessees' breach in *Brauer* was "material" and thus assumes that "there is nothing in *Brauer* to suggest that a *nonmaterial* breach of the lease also would have defeated the option rights of the lessees in that case." Text accompanying footnote 9 of the majority opinion. I disagree. First, the language in *Brauer* is broad, referring to "named conditions" of the lease without distinguishing between material and immaterial terms. *Brauer* v. *Freccia*, supra, 159 Conn. 294. Second, there is no reason for the court to have engaged in a materiality analysis, as the material versus immaterial distinction derives from the doctrine of substantial performance, not the law of unilateral contracts and options in this state. Third, in light of the facts of the present case, even if it is assumed that materiality is the proper test, which it is not, the breaches in the present case are clearly material, and, thus, even the standard of substantial performance has not been satisfied.

The doctrine of substantial performance, in my view, should not be extended to unilateral contracts. "[This] doctrine is generally applicable to *bilateral contracts* for an agreed *exchange of performances*." (Emphasis added.) J. Calamari & J. Perillo, The Law of Contracts (4th Ed. 1998) § 11.18 (b), p. 417. That is, "[t]he doctrine of substantial performance . . . is generally only applicable to contractual provisions in which a party is

*affirmatively obligated to perform.* See generally 3A A. Corbin, [Corbin on] Contracts [1960] §§ 700–701 [pp. 308–15]; 6 [W. Jaeger, Williston on] Contracts (3d Ed. [1962]) § 842 [pp. 165–71]." (Emphasis added.) *Analytical Design & Construction Group, Inc.* v. *Murray*, 690 P.2d 269, 272 (Colo. 1984). "Consequently, the doctrine of substantial performance *is not applicable to a unilateral [agreement]* . . . ." (Emphasis added.) Id., 273.[8]

The application of the substantial performance doctrine to unilateral contracts prematurely grants optionees rights that have not yet vested. "The doctrine is intended to protect the right to [performance] of those who have performed in all material and substantive particulars, so that their right to [performance] may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects." (Internal quotation marks omitted.) *In re Centennial Park, LLC*, 461 B.R. 853, 863 (Bankr. D. Kan. 2011). In a unilateral contract, however, the optionee does not have a right to exercise the option, let alone a right to performance, until the optionee has accepted the offer through performance of the named conditions. Therefore, application of the doctrine of substantial performance in this context provides the optionee with rights that he simply does not have.[9] It also strips the optionor of the benefits of his bargain, as conditions precedent often are part of the consideration for the option itself. Finally, it deprives both parties of a degree of economic certainty that is particularly beneficial in a commercial context. See *Loitherstein* v. *International Business Machines Corp.*, 11 Mass. App. 91, 94, 413 N.E.2d 1146 (1980) ("holding the possessor of a unilateral right of this sort to literal compliance with the requirements for its exercise enforces commercial certainty"). Accordingly, I conclude that the optionee must perform all conditions in strict accordance with their terms.

Turning to the issue in the present case, I conclude that the plaintiff, Pack 2000, Inc., did not strictly comply with the terms of the lease agreements, letter of intent, and management agreement and, thus, is not entitled to specific performance. The options at issue provided in relevant part: "So long as [the plaintiff] has been in compliance with the terms and conditions of [the] Lease, the Letter of Intent, and [the] Management Agreement . . . and is in compliance with such instruments when the option is exercised, [the plaintiff] shall have the option to purchase the real estate subject of this lease."[10] The trial court found, pursuant to the terms of the lease agreements, letter of intent, and management agreement, that the "[p]laintiff was required to make periodic payments to [the defendant, Eugene C. Cushman] and to third parties" and that the "[p]laintiff was sometimes late in making . . . payments and [that the defendant] frequently contacted [the] plaintiff regarding these late payments."[11] Because the language of the options required compliance not only at the time

of exercise, but also at all times prior thereto, the plaintiff forfeited its right to exercise the options as soon as it made a late payment,[12] even though it was not in arrears at the time of trial.[13] Therefore, because the plaintiff in the present case "fail[ed] to meet the named conditions of [its] lease[s]," the plaintiff "defeat[ed] [its] right to rely on [the options] when [it made] an effort to purchase the property pursuant to the option[s] in the lease[s]." *Brauer* v. *Freccia*, supra, 159 Conn. 294.

I am particularly concerned that the majority's substantial performance analysis rewrites the options. Under a logical extension of the majority's construction, the plaintiff would have to be in compliance with the lease agreements, letter of intent, and management agreement only at the time it exercises the options. That is, the plaintiff would be able to cure its prior noncompliance by settling any arrearages before exercising the options. The options, however, required that the plaintiff "*has been* in compliance . . . *and is* in compliance . . . when the option[s] [are] exercised . . . ." (Emphasis added.) This language signifies that past noncompliance *cannot* be cured, at least not by the optionee.[14]

Finally, I emphasize that the agreements between the plaintiff and the defendant constituted a commercial transaction between two sophisticated parties, both of whom contributed to the drafting of these contracts and previously participated in similar transactions. Thus, there is even less reason for the majority to insert itself into the contract and change its terms. The plaintiff's vice president, M. Paulina Anderson, testified that she provided the letter of intent and management agreement, and negotiated with the defendant to modify both documents. The defendant's testimony corroborates the fact that both parties actively participated in the negotiation and ultimate drafting of these documents. Furthermore, Anderson appears to have extensive experience in the acquisition of Midas automobile repair shops, as she testified to having assisted in the acquisition of thirty-two such shops since 1991. In the present case, the language of the agreements indicates that the timely payment of financial obligations was the only consideration the defendant would have received for entering into the option contracts. The defendant testified that "it was very, very important that everything [got] paid . . . on time" because the defendant "had to make payments from [the plaintiff's] payments," and, "if [he, the defendant] didn't make the payments . . . to Midas . . . Midas could pull the franchise . . . . If [he, the defendant] didn't make the payment for [his] mortgage [he] was going to lose the real estate." Furthermore, any late payment or nonpayment of the plaintiff's health insurance obligations would "jeopardiz[e] all of [the defendant's] health insurance." Because the timeliness of these payments was so important, the defendant "made it perfectly clear to

[the plaintiff]" that compliance with the terms of the lease agreements, letter of intent, and management agreement was necessary by including this condition in the options.

The defendant, however, did not get the benefit of his bargain, as the plaintiff consistently made late payments on many of its obligations, or, at times, did not make payments at all. Specifically, the Appellate Court observed: "[T]he record reveals that the following payments were late: the rent payment due on May 1, 2004; three payments on the promissory notes due on February 8, 2003, and May 8 and June 8, 2006; one payment to Groton Utilities, which resulted in a shutoff notice that the defendant forwarded to the plaintiff on January 23, 2003; several payments to a telephone company, which resulted in several collection letters and telephone calls that the defendant received in late 2002 and early 2003 as well as a threat to terminate telephone service to the defendant's unrelated business in March, 2003; two real estate tax installments on the New London [Midas] shop due January 1, 2005, and January 1, 2007; one real estate tax installment on the Groton [Midas] shop due July 1, 2007; twelve hazard and liability insurance installments between November, 2002, and January, 2004, that resulted in cancellation notices issued on July 30, 2003, and November 29, 2004; twenty health insurance installments between October, 2002, and September, 2005; and several installments under the terms of an equipment lease that resulted in several collection calls to the defendant in 2002 and 2003." *Pack 2000, Inc.* v. *Cushman*, 126 Conn. App. 339, 343–44, 11 A.3d 181 (2011). The majority's construction of the contract thus forces the defendant to comply with an agreement to which he did not agree.

In sum, strict compliance should apply to all conditions of an option contract, not just those relating to the election to accept the offer. In addition, in the context of an option to purchase real estate, I would conclude that "[t]here is no completed contract for sale of the property described in an option until the optionee has *accepted the offer according to its terms*, or to put it otherwise, *has performed the conditions contained in the offer*." (Emphasis added.) *Buchannon* v. *Billings*, supra, 127 Vt. 74; see also *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 145 Conn. App. 696, 710, 77 A.3d 165 ("[o]ptions . . . require optionees to exercise them in strict compliance with their terms"), cert. granted, 310 Conn. 940, 940–41, 79 A.3d 892 (2013). Because I would uphold the judgment of the Appellate Court but direct that court to remand the case to the trial court for a determination of whether the defendant waived the plaintiff's noncompliance; see footnote 13 of this opinion; I respectfully dissent.

[1] I note that comment (e) to § 45 of the Restatement (Second) suggests that full performance may be excused only "if the offeror prevents performance, waives it, or repudiates." Restatement (Second), supra, § 45, comment (e), pp. 120–21.

[2] See *Smith* v. *Hevro Realty Corp.*, 199 Conn. 330, 339, 507 A.2d 980 (1986) ("The principles that govern the interpretation of an option contract are well-settled. To be effective, an acceptance of an offer under an option contract must be unequivocal, unconditional, and in exact accord with the terms of the option." [Internal quotation marks omitted.]); *Lake Shore Country Club* v. *Brand*, 339 Ill. 504, 522, 171 N.E. 494 (1930) ("An option contract gives to the optionee a right under the named conditions. If those conditions are not met the optionee does not acquire the right."); *LeBaron Homes, Inc.* v. *Pontiac Housing Fund, Inc.*, 319 Mich. 310, 315, 29 N.W.2d 704 (1947) ("[a]n option may ripen into a binding bilateral contract of purchase and sale by a seasonable exercise of the option and compliance with its terms by the optionee"); *Buchannon* v. *Billings*, supra, 127 Vt. 74 ("If conditions precedent to the right to convert a unilateral contract into a bilateral one are not met the unilateral contract does not become bilateral. . . . There is no completed contract for sale of the property described in an option until the optionee has accepted the offer according to its terms, or to put it otherwise, has performed the conditions contained in the offer." [Citations omitted.]).

[3] The majority does not appear to contest that "[t]he rule of substantial compliance with the terms of the contract which is applicable to bilateral contracts whereby both parties are already bound is not applicable to the *exercise* of an option . . . ." (Emphasis added.) *Jones* v. *Horner*, 36 Tenn. App. 657, 660, 260 S.W.2d 198 (1953).

[4] See, e.g., *Smith* v. *Hevro Realty Corp.*, 199 Conn. 330, 343, 507 A.2d 980 (1986) (concluding that optionee failed to exercise its option in accordance with terms of agreement because it did not tender deposit required at time of its verbal acceptance of option); see also *Saewitz* v. *Epstein*, 6 F. Supp. 2d 151, 157 (N.D.N.Y. 1998) ("[T]he actual exercise of an option contract by the optionee is the performance of a condition precedent to the optionor's duty to perform. [1A A. Corbin, Corbin on Contracts (1950)] § 264 [p. 509].").

[5] See, e.g., *Brauer* v. *Freccia*, supra, 159 Conn. 293–94 (concluding that optionee did not have right to enforce option to purchase because he did not comply with terms of option, which required that optionee "shall have duly and punctually fulfilled all the provisions, agreements, covenants and conditions of [the] lease" [internal quotation marks omitted]); *Pear* v. *Davenport*, 67 Mass. App. 239, 245, 853 N.E.2d 206 (2006) (concluding that tenants were not entitled to specific performance of option to purchase property when they failed to comply with terms of lease by not making timely rental payments).

[6] See, e.g., *Bennett* v. *Foust*, 996 P.2d 693, 696–97 (Wyo. 2000) (death of shareholder was condition precedent to option).

[7] Some other jurisdictions similarly do not make this distinction. See, e.g., *Beecher* v. *Morse*, 286 Mich. 513, 516, 282 N.W. 226 (1938) ("[a]n option is but an offer, strict compliance with the terms of which is required; acceptance must be in compliance with the terms proposed by the option both as to the exact thing offered and within the time specified; otherwise the right is lost" [internal quotation marks omitted]); *Raanan* v. *Tom's Triangle, Inc.*, 303 App. Div. 2d 668, 669, 758 N.Y.S.2d 343 (2003) ("[i]t is well settled that one attempting to validly exercise an option to purchase real property must strictly adhere to the terms and conditions of the option contract").

[8] See *People* v. *Mohammed*, 162 Cal. App. 4th 920, 932–33, 76 Cal. Rptr. 3d 372 (2008) ("the judicially created doctrine of substantial compliance is not available . . . [for] a unilateral contract"); *St. Paul at Chase Corp.* v. *Manufacturers Life Ins. Co.*, 262 Md. 192, 229, 278 A.2d 12 ("[w]hile the doctrine of substantial performance is applied most frequently in building and construction contracts, it is not so limited and may be applied in the case of any kind of *contractual obligation to perform*" [emphasis added; internal quotation marks omitted]), cert. denied, 404 U.S. 857, 92 S. Ct. 104, 30 L. Ed. 2d 98 (1971); *Creed* v. *Apog*, 6 Mass. App. 365, 372–73, 376 N.E.2d 154 (1978) ("[S]ubstantial performance . . . applies only to bilateral contracts in which the parties have agreed to exchange performances without making either performance expressly conditional on the other or on the occurrence of a particular event. . . . To apply the substantial performance doctrine in a case . . . in which [a party's] performance was expressly conditioned [on] the occurrence of events [that] never happened . . . would result in the court's mak[ing] a contract for the parties contrary to [i]ts duty . . . to construe the contract [that] they fully understood and entered into voluntarily." [Citations omitted; footnote omitted; internal quotation marks omitted.]), vacated on other grounds, 377 Mass. 522, 386 N.E.2d 1273 (1979).

[9] As a result of the differences between unilateral and bilateral contracts,

courts have determined that other doctrines that normally apply to bilateral contracts should not apply to unilateral agreements. In *Lake Shore Country Club* v. *Brand*, supra, 339 Ill. 504, the Illinois Supreme Court determined that the equitable rule against forfeitures, which applied to bilateral contracts such as leases, did not apply to option contracts: "An option contract does not come within the equitable rule against forfeitures. . . . An option contract gives to the optionee a right under the named conditions. If those conditions are not met the optionee does not acquire the right. Such a situation involves none of the elements of a forfeiture. It deprives no party of any right and abrogates no contract, but, on the other hand, is but the enforcement of the contract made by the parties. . . . A court of equity cannot relieve the optionee from the effect of his failure to comply with the conditions on which he has been granted the privilege of buying. This would make a new contract for the parties and compel the owner to sell when he had not agreed to do so. *The optionee must perform all conditions precedent to his right to purchase not waived by the optionor*. In this respect the denial of an option to purchase property differs from the forfeiture of property rights already acquired under a bilateral contract. . . . Therefore, unless the [optionee] has met the conditions of the option contract or the conditions have been waived it is not entitled to exercise the option." (Citations omitted.) Id., 522.

[10] The majority states that the "option agreement" in the present case "is not 'a simple unilateral contract of option' . . . . [R]ather, the option agreement is but one component of the parties' *bilateral* lease and management agreements." (Citation omitted; emphasis in original.) Footnote 12 of the majority opinion. I disagree. First, the options, although made within the context of other bilateral agreements, constitute separate agreements. The management agreement provides that the option "shall be by separate agreement and . . . shall cite separate consideration . . . ." That consideration is compliance with the terms of the leases. The options thus reference a bilateral contract to provide some of the terms and conditions, but that reference does not, and should not, render the options themselves or their conditions subject to the compliance standards of a bilateral agreement. As I previously explained, this court has stated that an optionee must comply with all "named conditions" of an option contract, including conditions set forth in a separate bilateral agreement. *Brauer* v. *Freccia*, supra, 159 Conn. 294. To hold otherwise would mean that a condition would be held to a different compliance standard depending on whether it was set forth in the option itself or incorporated by reference in a bilateral agreement. As I previously explained, there is no reason to hold different conditions in an option contract to different compliance standards. Therefore, I would conclude that strict compliance applies to all conditions regardless of whether they are set forth in the option itself or in another agreement that refers to the option.

[11] For example, the management agreement requires that the plaintiff make payments on the promissory notes on the first day of each month. The agreement does not allow for a grace period for these payments. In February, 2003, however, the plaintiff was eighteen days late in making a payment on one of the promissory notes. Thus, the plaintiff was not in compliance with the management agreement and, accordingly, forfeited its right to exercise the options. Although there is evidence in the record that the defendant allowed the plaintiff to pay on the eighth of the month, and that the defendant provided the plaintiff with a thirty day grace period, these facts are relevant to whether there was a *waiver*, not whether the plaintiff was in compliance with the terms of the agreements.

[12] Although the lease agreements, letter of intent, and management agreement do not provide a deadline by which the plaintiff must make payments to third parties, it is clear that the plaintiff was not in compliance with this condition under any standard. Because the options required the plaintiff *to have been* in compliance with the agreements, the plaintiff would have been out of compliance as soon as it missed a payment, thereby forfeiting its right to exercise the options unless the defendant waived his own rights under the options. For instance, the record reveals that an insurance provider issued a cancellation notice on July 30, 2003, after the plaintiff had failed to make payments for at least *three months*. The payments to third parties are included in the lease agreements as "[a]dditional [r]ent," and the lease agreements provide that, if "rent shall remain unpaid 10 days after the same shall become payable . . . then this lease shall thereupon terminate . . . ." Under any standard of compliance, three months of non-payment would constitute noncompliance, and, therefore, the plaintiff's right to exercise the options would be extinguished in the absence of a waiver by the defendant.

[13] Because the trial court determined that the substantial performance standard applied and was met in the present case, it did not make a factual finding regarding whether the defendant waived the plaintiff's noncompliance by accepting the plaintiff's late payments. Accordingly, I would remand the case to the trial court so that it may make factual findings concerning this issue.

[14] I emphasize that the optionor may waive the optionee's noncompliance, as this court previously articulated in *Brauer* v. *Freccia*, supra, 159 Conn. 295. "Waiver is a species of estoppel. Both have roots in equity and may be implied from the acts or conduct of the parties." *Frantz* v. *Romaine*, 93 Conn. App. 385, 400, 889 A.2d 865, cert. denied, 277 Conn. 932, 896 A.2d 100 (2006). Waiver thus serves as a safety valve to protect optionees from unscrupulous optionors, who otherwise might convince optionees that noncompliance is acceptable and subsequently use that noncompliance as a ground to extinguish the option.

———————————————