Richard BENNETT, individually and Peterson Distributing Company, a Wyoming corporation jointly and severally, Appellant (Plaintiff),

v.

Ingrid FOUST, Personal Representative of the Estate of Lillian Bennett; and Kelly Clay, Appellees (Defendants).

No. 98–260.

Supreme Court of Wyoming.

Feb. 22, 2000.

Representing Appellant: Gregory C. Dyekman and Kristen J. Schlattmann of Dray, Thomson & Dyekman, P.C., Cheyenne, WY. Argument by Mr. Dyekman.

Representing Appellees: Thomas A. Fasse of Miller & Fasse, P.C., Riverton, WY for appellee Foust; and John W. Davis of John W. Davis, Attorney at Law, P.C., Worland, WY for appellee Clay. Argument by Messrs. Fasse and Davis.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

LEHMAN, Chief Justice.

After the appellee personal representative entered into a contract for sale of the estate's corporate stock, appellant filed suit seeking to enjoin the sale, relying on the corporation's Buy–Sell Agreement. The district court entered summary judgment declaring the contract for sale valid and unimpeded by

the Buy–Sell Agreement. We conclude that the appellant provided notice, pursuant to the provisions of the Buy–Sell Agreement, that the company intended to exercise its option to purchase the stock, thus precluding the personal representative from selling the stock to anyone else. Accordingly, we reverse.

## ISSUES

Appellant Richard Bennett presents two issues for our review:

1. A Buy–Sell Agreement executed by a corporation and its shareholders which restricts the transfer of stock of the corporation is not manifestly unreasonable and is therefore valid, binding and enforceable, and consistent with public policy.

2. Shareholders may not circumvent a Buy–Sell Agreement executed by the corporation and its shareholders and sell shares of a corporation to a non-shareholder when such a sale is not contemplated or permitted by the agreement.

Appellees Ingrid Foust and Kelly Clay rephrase the issues as:

1. Did the district court err when it ruled that paragraph 7 of the Peterson Distributing Company's Buy–Sell Agreement, allowing an absolute, arbitrary veto of any and all transfers of shares for any reason, was "manifestly unreasonable?"

2. Did the district court commit reversible error when it ruled that third persons could make offers to purchase Peterson Distributing Company stock subject to meeting the valid terms of the Buy–Sell Agreement?

## FACTS

Peterson Distributing Company was formed by Richard Bennett Sr. and Lillian Bennett, husband and wife, and Lillian's mother, Tilda Peterson, on June 23, 1953. The company was created for the purpose of the wholesale distribution of malt beverages, with its principal place of business in Fremont County. Richard Bennett Sr. and Tilda Peterson passed away, and ownership of the company filtered down to the next generation. As of June 4, 1990, appellant Richard

K. Bennett Jr.(Bennett) owned 55%, his sister, Linda Treadway (Treadway), owned 35%, and their mother, Lillian Bennett, retained 10% of the available shares. Bennett served as President of the corporation, while Treadway served as secretary-treasurer.

On July 27, 1990, the shareholders entered into the Peterson Distributing Company Buy–Sell Agreement. The agreement provided procedures for the transfer of available stock in the event that any of the shareholders desired to sell during their lifetimes, received an offer from a non-shareholder, or died. The agreement established a mechanism for the determination of share price upon the death of any shareholder and provided that the corporation could veto any attempted transfer of stock to non-shareholders.

Lillian Bennett died on September 16, 1996, and her daughter Ingrid Foust (Foust) was appointed personal representative of the estate. On September 26, 1996, notice of a special meeting of Peterson Distributing Company was sent to Foust, among others. The notice advised that:

Items of business to be covered shall be to determine persons with access to the corporate banking accounts, to review the Buy–Sell Agreement dated the 27th day of July, 1990 and to give notice to the appropriate persons of the intent to exercise the rights held by the corporation and/or by Richard Bennett under the terms of the Buy–Sell Agreement.

At the special meeting held on October 10, 1996, Bennett stated in the form of a motion that:

On behalf of Peterson Distributing Company, I am giving notice to all shareholders that the Corporation is exercising its right pursuant to the Buy–Sell Agreement to purchase the shares of Lillian Bennett.

After some discussion, Bennett called for a second to the motion. Receiving none, he called for a vote. Bennett voted his 55% for the motion, while Foust and Treadway abstained. No further action was taken on this motion by either the corporation or the estate.

Approximately two months after the corporate notice, on December 17, 1996, Foust entered into a contract with Kelly Clay (Clay), a competing distributor, for the sale of her mother's 10% interest in the corporation. They executed an escrow agreement, and the purchase price of $28,571.43 was placed in escrow pending resolution of the issues related to the Buy–Sell Agreement. Foust sent Bennett notice of the contract on December 30, 1996. On January 7, 1997, asserting he was entitled to examine the offer and escrow agreement, Bennett objected to the terms and conditions of the notice.

On February 3, 1997, Bennett filed a complaint in district court requesting that the court declare the parties' rights and obligations under the Buy–Sell Agreement. He also asked for an order temporarily restraining and permanently enjoining Foust from selling to Clay. On July 7, 1997, Bennett offered to buy, at the same per share price offered by Clay, his pro rata share of Lillian's shares pursuant to the Buy–Sell Agreement's provisions for purchase by shareholders. On November 5, 1997, Bennett attempted to make an initial payment on the shares, by sending the estate $2,800.00.

Foust and Clay moved for summary judgment, declaring that the sale to Clay was valid and subject to no impediment from the Buy–Sell Agreement. The district court found that Foust gave notice of intent to dispose of the shares to the corporation, that the corporation did not respond within the prescribed period and, therefore, had waived its right to purchase the shares. The court further found that the corporation could not veto the sale, as paragraph 7.1 of the agreement was an unreasonable restriction on the transfer of shares because it did not provide a time limit or state that consent could not be unreasonably withheld.[1] The district court later found that the order was final pursuant to W.R.C.P. 54(b), and this timely appeal followed.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c).

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*40 North Corp. v. Morrell,* 964 P.2d 423, 426 (Wyo.1998) (citations omitted).

■ We have held that summary judgment is appropriate in cases involving contracts when the language of the agreement is plain and unequivocal. *Id.; Flying J, Inc. v. Booth,* 773 P.2d 144, 148 (Wyo.1989). The interpretation of an unambiguous contract is a question of law; and, for that reason, summary judgment is appropriate with respect to disputes relating to unambiguous contracts. *40 North Corp.,* 964 P.2d at 426; *Lincoln v. Wackenhut Corp.,* 867 P.2d 701, 703 (Wyo. 1994).

## DISCUSSION

Foust and Clay contend that the corporation only has a reasonable amount of time to execute a purchase agreement upon the death of a shareholder. If no such agreement is made within a reasonable time, Foust and Clay argue that the personal representative is permitted to entertain offers from non-shareholders. Bennett counters that the plain language of the Buy–Sell Agreement does not provide for the sale to non-shareholders upon the death of a shareholder and argues that the provisions of the agreement require the corporation or the remaining

---

1. Paragraph 7.1 provides:

7. NON–ALIENATION OF SHARES:

7.1 No Shareholder shall sell, assign, pledge, hypothecate, or in any manner transfer or encumber any interest in all or any part of the shares of stock of the Company without the prior written consent of the Company and all the other Shareholders.

shareholders to purchase the shares from the estate. We need not consider whether the agreement permits sales to non-shareholders upon the death of a shareholder because we find that the corporation properly exercised its option to purchase the shares, thereby precluding the sale to Clay.

The agreement provides specific procedures for the purchase of shares upon the death of any shareholder. Paragraph 5.1 provides:

> Upon the death of any Shareholder, except for the provision contained in paragraph 4.1 [2] above, the Personal Representative of the decedent's estate, or the heirs and devisees of the decedent, as the case may be, shall sell to the Company and the Company shall purchase from the Personal Representative, or the heirs and devisees, all the decedent's shares of stock in the Company. If within 30 days following the death of the deceased Shareholder the Company shall not give notice of the intent to purchase the decedent's shares, then, within 90 days after the Company's 30 day notice period the Shareholders surviving the deceased Shareholder shall have the right to give notice of intent to purchase the shares upon the terms and conditions set forth herein.

Once the company gives notice of its intent to purchase the decedent's shares, the agreement provides mechanisms for establishing the purchase price.

### 6. PURCHASE PRICE UPON DEATH OF SHAREHOLDER:

> 6.1 The purchase price shall, annually, on the date of the annual shareholders' meeting, be agreed upon between the Company and the Shareholders and shall be endorsed on this agreement.
>
> 6.2 If the Shareholders do not endorse the purchase price in the year preceding the decedent's death, they may, by agreement, use the last previously agreed upon purchase price.

> 6.3 If the parties can not agree to the purchase price, then the purchase price shall be established by a board of arbitrators. The parties hereto agree to submit the matter to arbitration and agree to be bound by the decision of the arbitrators.

The agreement then provides a mechanism for the appointment of the board of arbitrators.

Upon establishment of the purchase price, if the decedent was not covered by a key man insurance policy, the agreement provides:

> 5.5 If the value of the life insurance on the decendent [sic] is less than the purchase price, or if the decedent not be insured, then the Company shall issue to the Personal Representative of the estate or to the heirs and devisees of the decedent, its promissory note for the balance of the purchase price, payable over a period of ten (10) years, in equal annual installments, together with interest at 10% per annum on the unpaid balance. Payment shall commence one year from the purchase date.

Turning to the effect of these provisions, we first conclude that paragraph 5.1 establishes, upon the death of any shareholder, an option contract in favor of the corporation.

> An option is a continuing offer to sell and, even though it is conditioned for exercise within a limited time, the option is nevertheless an executory, unilateral contract. . . . The exclusive right to conclude the transaction must be vested solely in the optionee, and the optionor must have no choice but to abide by the terms of the commitment.

*Covey v. Covey's Little America, Inc.,* 378 P.2d 506, 517 (Wyo.1963). Once an option is exercised, it converts from a unilateral to a bilateral contract, which binds both parties. *Madison v. Marlatt,* 619 P.2d 708, 714 (Wyo. 1980) (citing *Braten v. Baker,* 78 Wyo. 273, 282, 323 P.2d 929, 931 (1958)).

---

**2.** Paragraph 4.1 provides:
4. TESTAMENTARY DISPOSITION
4.1 It is understood and agreed that Lillian Bennett may dispose of her shares by testamentary bequest to Linda Treadway. No other testa-

mentary gift may be made by her, nor shall any testamentary disposition of shares by any other Shareholder be binding upon the Company or the Shareholders.

Foust and Clay argue that the option was lost, because Bennett did not execute, within a reasonable amount of time, the promissory note mentioned in paragraph 5.5. They point to the well-established rule of law that,

> options are to be strictly construed and where the option is to be exercised within a stated time and in a particular manner, that must be done exactly as prescribed unless, perhaps, there is some intervening circumstance which the law recognizes as one of the impossibilities which make failure of compliance an exception to the rule.

*Bidache, Inc. v. Martin,* 899 P.2d 872, 874 (Wyo.1995) (quoting *Crockett v. Lowther,* 549 P.2d 303, 310 (Wyo.1976) and *Covey,* 378 P.2d at 517).

■ We cannot disagree with this rule; however, execution of the promissory note is not a necessary predicate to the valid exercise of the corporation's option. The plain language of paragraph 5.1 illustrates that the option is properly exercised when the corporation gives notice of intent to purchase the shares. There is no dispute that on October 10, 1996, Bennett, on behalf of the corporation, gave notice to the personal representative of its intention to purchase the decedent's shares. Since the condition precedent to the option, i.e., the death of a shareholder, took place and the option was exercised by giving notice, both parties were bound by the resulting bilateral contract to establish the purchase price for the shares pursuant to paragraph 6.

■ Unfortunately, neither party made any effort to establish the purchase price. Foust and Clay contend that the resulting delay was unreasonably long, and " '[w]hen no time for performance is specified, the law implies performance must be within a reasonable time and what is a reasonable time

depends upon the circumstances of each case.' " *Matney v. Webster,* 808 P.2d 212, 214 (Wyo.1991) (quoting *Zitterkopf v. Roussalis,* 546 P.2d 436, 439 (Wyo.1976)). However, such an assertion cannot be reasonably defended when Foust made no attempt to establish a purchase price or submit the matter to arbitration as provided by the agreement. In addition, the record is clear that Foust entered into the contract for sale with Clay less than three months after notice was given by the company, thus embarking the parties on the present litigation. Under these circumstances, we cannot say that the delay was unreasonable.

## CONCLUSION

We hold that notice by the corporation of its intention to purchase the decedent's shares pursuant to the Buy–Sell Agreement precluded Foust from accepting Clay's offer. Summary judgment, therefore, was improperly granted in favor of Foust and Clay. With notice given, the next step in the process, pursuant paragraphs 6.1—6.3 of the Buy–Sell Agreement, is to establish a purchase price or submit the issue to binding arbitration. As we find that the estate is bound to sell its shares to the corporation, we need not consider the propriety of the district court's finding that paragraph 7.1 is an unreasonable restriction on the transfer of shares.

Reversed and remanded for proceedings consistent with this opinion.