******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PACK 2000, INC. *v.* EUGENE C. CUSHMAN
(SC 18789)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh,
McDonald and Vertefeuille, Js.*

*Argued March 12, 2013—officially released May 20, 2014*

*Eric W. Callahan*, for the appellant (plaintiff).

*Andrew J. O'Keefe*, with whom, on the brief, was
*Joseph M. Busher*, *Jr.*, for the appellee (defendant).

*Opinion*

PALMER, J. In July, 2002, the plaintiff, Pack 2000, Inc., and the defendant, Eugene C. Cushman, entered into a series of agreements pursuant to which the defendant was to transfer the management and, ultimately, at the option of the plaintiff, the ownership of two Midas automobile repair shops to the plaintiff. The agreements also provided the plaintiff with options to purchase the realty on which the shops were located, on condition that the plaintiff, at the time it exercised the options, was and previously had been in compliance with the terms of the agreements. In August, 2003, the plaintiff sought to exercise the options, but the defendant refused to convey the properties, claiming that the plaintiff had not strictly complied with the terms of the agreements. The plaintiff thereafter brought the present actions, alleging entitlement to specific performance of the options to purchase the realty.[1] Following a court trial, the court concluded that the plaintiff was entitled to specific performance of the options because it had substantially complied with the terms of the agreements. The defendant appealed to the Appellate Court, claiming that the trial court improperly had applied a standard of substantial compliance, rather than a standard of strict compliance, with the terms of the parties' agreements in determining whether the plaintiff had satisfied the conditions precedent for exercising the options. See *Pack 2000, Inc.* v. *Cushman*, 126 Conn. App. 339, 340–41, 345–46, 11 A.3d 181 (2011). The defendant also claimed that the evidence established that the plaintiff had not strictly complied with the agreements. Id., 346. The Appellate Court agreed with both of the defendant's claims and, accordingly, reversed the judgments of the trial court and remanded the case to that court with direction to render judgments for the defendant. Id., 341, 351. We granted the plaintiff's petition for certification to appeal, limited to the following issues: "Did the Appellate Court properly determine that lease/option agreements are subject to a strict compliance standard? If so, should the [judgment of the] Appellate Court be reversed under the applicable standard?" *Pack 2000, Inc.* v. *Cushman*, 301 Conn. 907, 19 A.3d 177 (2011). We agree with the plaintiff that, contrary to the conclusion of the Appellate Court, the trial court properly applied a standard of substantial rather than strict compliance in resolving the plaintiff's claim and, further, that the trial court properly determined that the plaintiff is entitled to specific performance of the options because it had substantially complied with the terms of the parties' agreements. We therefore reverse the judgment of the Appellate Court and remand the case to that court with direction to affirm the judgments of the trial court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history, as sup-

plemented by the record. "In July, 2002, the plaintiff, the defendant and ARCO Corporation (ARCO),[2] a corporation controlled by the defendant, entered into a business transaction in which two Midas [automobile repair] shops[3] (shops) were to be transferred from ARCO to the plaintiff. As part of the transaction, the parties executed a number of agreements, including [1] two lease agreements, under which the defendant leased [to the plaintiff] the [real property on which] the shops are located . . . [2] a management agreement, under which the plaintiff assumed responsibility for the management and operation of the shops . . . [3] a letter of intent . . . and [4] two promissory notes. [The defendant, an experienced attorney, drafted all of the agreements between the parties.]

"Each lease agreement contains a clause . . . that provide[d] the plaintiff with an option to purchase the leased [property] subject to certain terms and conditions. The language of the two clauses is essentially identical. Each clause provides in relevant part: 'So long as [the plaintiff] has been in compliance with the terms and conditions of this Lease, the Letter of Intent, and Management Agreement . . . and is in compliance with such instruments when the option is exercised, [the plaintiff] shall have the option to purchase the real estate subject to this lease. . . . The option shall be exercised by [the plaintiff] giving [the defendant] three months advanced notice, in writing. The option may be exercised by giving the aforesaid notice between the date of this Lease [July 25, 2002] and the fifth anniversary of [the] same.'

"The management agreement also refers to the plaintiff's options to purchase the defendant's realty and contains the following language . . . as it relates to the options: 'The [plaintiff] shall be given an option to purchase the real estate upon which the shops are located. Said option shall be by separate agreement and signed by the titleholder and the party designated by [the plaintiff] to take title. Such option shall cite separate consideration and shall contain the terms as generally outlined herein. (a) Such option may be exercised between [the] date of commencement herein and the fifth anniversary of [the] same. . . . (f) [The plaintiff] must be in full compliance with this agreement and any lease agreement at the time of exercise.' [The management agreement also contains a provision granting the plaintiff an option to purchase the shops '[s]o long as [the plaintiff] is in compliance with all of the terms and conditions of [the management] agreement, the letter of intent and any option agreement . . . .']

"In addition to the two lease agreements and the management agreement, the letter of intent also contains language that refers to the options [to purchase the realty]. It provides in relevant part: '[The plaintiff] has the option to purchase from [the defendant] the

buildings and the land housing the [s]hops, if this agreement and the . . . Management Agreement are executed. The option is for five years from the date of the Management Agreement. The price will be as appraised.'

"Under the terms of the two lease agreements, the management agreement and the promissory notes, the plaintiff was required to make a number of periodic payments both to the defendant and to certain third parties in order to exercise the options. Specifically, the plaintiff was required to pay rent to the defendant by the first day of each month during the term of the lease[s], to make payments on both promissory notes by the eighth day of each month until the notes were fully paid and to pay all accounts, including, but not limited to, utilities, telephone service, real estate taxes, and hazard and liability insurance as well as an equipment lease. At trial, the defendant testified that timely payment of the aforementioned accounts was vital and that he informed the plaintiff that untimely payments would jeopardize his franchise agreements with Midas and his mortgages on the two shops.

"Nevertheless, the record reveals that the plaintiff was often late in making the aforementioned payments. Specifically, the record reveals that the following payments were late: the rent payment due on May 1, 2004; three payments on the promissory notes due on February 8, 2003, and May 8 and June 8, 2006; one payment to Groton Utilities, which resulted in a shutoff notice that the defendant forwarded to the plaintiff on January 23, 2003; several payments to a telephone company, which resulted in several collection letters and telephone calls that the defendant received in late 2002 and early 2003 as well as a threat to terminate telephone service to the defendant's unrelated business in March, 2003; two real estate tax installments on the New London shop due January 1, 2005, and January 1, 2007; one real estate tax installment on the Groton shop due July 1, 2007; twelve hazard and liability insurance installments between November, 2002, and January, 2004, that resulted in cancellation notices issued on July 30, 2003, and November 29, 2004; twenty health insurance installments between October, 2002, and September, 2005; and several installments under the terms of an equipment lease that resulted in several collection calls to the defendant in 2002 and 2003. [With respect to these late payments, however, the trial court found that all 'were, on the whole, made within a commercially reasonable time' and, further, that the tardiness of the payments was attributable to 'administrative inefficiency as opposed to financial insolvency.']

"On August 22, 2003, the plaintiff's vice president, M. Paulina Anderson, faxed a letter to the defendant in which she stated that she wanted 'to finalize the purchase of the shops and exercise the option[s] to pur-

chase the real estate by the end of 2003.' On August 29, 2003, Anderson sent a second letter to the defendant in which she sought information about . . . possible appraisal[s] and indicated that Banterra Bank (bank) could not commit to financing the purchase until it had ascertained the value of the defendant's realty.

"On September 2, 2003, the defendant, on behalf of ARCO, sent a letter to Anderson in which he stated that the plaintiff was not in compliance with the terms and conditions of the management agreement. Specifically, the letter stated: 'The installment payment regarding the . . . Management Agreement which was due September 1, 2003 has not been received. Per the provisions of said agreement, the monthly installments are due on the first day of each month. Your monthly payments have been consistently late and have required telephone calls from [ARCO] nearly every month in order to prompt the payment. Timely payment of the note was and is a material condition of the agreement. As you have known from the inception, ARCO . . . is dependent [on] timely payments from you in order to remain in compliance with its obligations concerning various mortgages. Your late payment for August put ARCO . . . in default with one of its mortgagees. This is an intolerable circumstance. You are hereby put on notice that this late payment, and all of the prior late payments, and any future late payments [put] you out of compliance with the terms and conditions of the Management Agreement. Subsequent acceptance of the September, 2003 payment (or any future payment tendered after the date due) will not cure the non-compliance, nor does ARCO . . . waive any rights or consequences which flow from your non-compliance.' There is no record of the plaintiff having specifically responded to this letter. [It is apparent, however, that the parties treated this letter as the defendant's repudiation of the plaintiff's right to exercise the purchase options due to its late payments.]

"On May 16 and 19, 2006, the plaintiff again sought to exercise the options to purchase the defendant's realty. At that time, however, the payment on one of the promissory notes that was due on May 8, 2006, had not been paid.

"On July 17, 2006, the plaintiff commenced these actions against the defendant claiming that it was entitled to specific performance of the options to purchase the defendant's realty. In its disclosure of defense, filed on August 4, 2006, the defendant argued that the plaintiff's claim was without merit because, among other things, the plaintiff had not complied with the terms of one of the promissory notes and the conditions of the lease at the time of its attempt to exercise the options, and, therefore, the options had been forfeited or terminated by the plaintiff's fault or noncompliance. As of the date of trial, the plaintiff had paid the defendant in

excess of $600,000 in rent under the terms of the lease agreements, $700,000 under the terms of the promissory notes and was not in arrears on its financial obligations under the terms of any of the aforementioned agreements." (Footnotes altered.) *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 341–45.

At trial, the defendant testified that, although he believed that many of the late payments "technically were [in] noncompliance" with the parties' agreements, he did not take any action against the plaintiff with respect to those payments until after the plaintiff sought to exercise the options because it was not until then that the defendant decided he had "had enough." As the defendant stated, he did not "at any time" prior to August 22, 2003, "press" any of these late payments as grounds for terminating the options, apparently because he did not believe that there was sufficient need or reason to do so. The defendant further testified that, in view of the nature of the parties' transaction, in particular, the fact that all of the accounts remained in his name, so that he, rather than the plaintiff, received all of the monthly billing statements, the defendant "understood that [initially, there] were going to [be] some bumps . . . ." "There were all kinds of [tele]-phone calls back and forth between [the defendant's] organization and [the plaintiff's] organization, [as the parties were] trying to figure out [who was] paying which bill, which responsibility, what adjustments." Furthermore, each of the agreements contains a default provision pursuant to which the defendant was required to give written notice of a default, after which the plaintiff has either twenty days (lease agreements) or thirty days (management agreement) to cure the default. "Default" is defined in the management agreement to include, "but not be limited to, nonpayment of any obligation . . . ." The defendant, however, never gave notice of a default prior to the plaintiff's request to exercise the options.

The defendant also testified that, although he was aware that compliance with the lease and management agreements was a condition precedent to the plaintiff's right to exercise both the options to purchase the shops and the options to purchase the real property, he had "no problem" with the plaintiff exercising the shop options. Specifically, the defendant testified, with respect to the shop options, that the plaintiff "[has not] been defaulted. [The plaintiff has] not always been in compliance; but [it has] made payments. I'm not concerned with that." The defendant also testified that, "[i]f [the plaintiff] wanted to pay cash for . . . the Groton or New London shops and pay down [the promissory] note, I would not consider [the plaintiff] in noncompliance. I would agree to that. I would let [the plaintiff] do that."

"On August 11, 2008, the trial court rendered judg-

ments in favor of the plaintiff. The court determined that the plaintiff had retained the right to exercise the options because it had substantially complied with the terms and conditions of the [parties' agreements]. [In support of this conclusion, the court found that the late payments generally had been made within a commercially reasonable time.] The court also determined that the plaintiff had effectively exercised the options on August 22, 2003, and was entitled to specific performance.[4] The court, therefore, ordered the defendant to sell the realty at issue to the plaintiff under the terms of their agreements."[5] (Footnote added.) *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 345–46. In reaching its conclusion, the trial court observed that, although a strict compliance standard applies to the "actual exercise of an option"; (emphasis omitted); when an option is conditioned on a lessee's compliance with a lease, a substantial rather than strict compliance standard applies to "the issue of whether a lessee possesse[s] the right to exercise an option," that is, to the issue of the sufficiency of the lessee's performance under the lease. With respect to the issue of specific performance, the trial court found that the defendant had "enjoyed, and continues to enjoy, the benefits of the agreements with the plaintiff, including the receipt of [more than] $1.3 million since 2002." The trial court concluded that "[t]o allow [the defendant] to enjoy [all of] the benefits of his bargain with [the] plaintiff while avoiding the less financially attractive elements of the transaction," namely, conveyance of the real property on which the shops are located, "would be inequitable." In a subsequent articulation, the trial court stated that the plaintiff had established by a preponderance of the evidence that it was "ready, willing and able to exercise the options" at the time that it sought to do so.

The defendant appealed to the Appellate Court from the judgments of the trial court, claiming, inter alia, that the trial court was required to apply a strict rather than a substantial compliance standard in determining whether the plaintiff had satisfied the terms of the lease and management agreements and, in addition, that the trial court incorrectly concluded that the plaintiff had retained the right to exercise the options notwithstanding its late payments to the defendant. See *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 340–41. The Appellate Court agreed with the defendant. Id., 341. Relying primarily on *Brauer* v. *Freccia*, 159 Conn. 289, 268 A.2d 645 (1970), the Appellate Court explained that this court "has determined, albeit implicitly, that when a lease provides the lessee with the option to purchase realty subject to certain terms and conditions, the right of the lessee to exercise the option is contingent on the lessee's strict compliance with those terms and conditions." *Pack 2000, Inc.* v. *Cushman*, supra, 347. The Appellate Court further determined that, because the plaintiff was obligated under the lease "to make

periodic payments to the defendant and to certain third parties by specified deadlines"; id., 350; but was "often late in making [those] required payments"; id., 351; the plaintiff's right to enforce the options had expired prior to August 22, 2003, the date on which, according to the trial court, the plaintiff had effectively exercised the options. See id., 346, 350–51. In accordance with these conclusions, the Appellate Court reversed the judgments of the trial court and remanded the case to that court with direction to render judgments for the defendant.[6] Id., 351.

On appeal to this court, the plaintiff challenges the Appellate Court's determination that the trial court improperly applied a substantial compliance standard in concluding that the plaintiff was entitled to specific performance of the options. For the reasons set forth hereinafter, we agree with the plaintiff that, when a purchase option is conditioned on a lessee's compliance with the terms of a lease, in the absence of express contractual language to the contrary, the option is enforceable against the lessor if the lessee has substantially complied with the lease terms and the lessee is not in default at the time it seeks to exercise the option. We also agree with the plaintiff that the trial court reasonably found that the plaintiff had substantially complied with the lease and management agreements. Finally, we reject the defendant's claim that the judgment of the Appellate Court may be affirmed on the alternative ground that the evidence does not support the trial court's finding that the plaintiff was ready, willing and able to purchase the properties at the time it sought to do so.

I

We first address the plaintiff's claim that the Appellate Court incorrectly concluded that the plaintiff forfeited the right to exercise the options because it failed to make certain periodic payments to the defendant and other third parties by deadlines specified in the parties' agreements.[7] In support of its claim, the plaintiff maintains that the Appellate Court misinterpreted and, as a result, misapplied our decision in *Brauer*, which, according to the plaintiff, is entirely consistent with the general rule that a lessee is entitled to enforcement of the lease provisions if it has complied substantially with its obligations under the lease. The plaintiff further contends that this general rule requiring substantial rather than strict compliance with the lease terms applies to its performance under the lease and management agreements.

Several well established principles guide our analysis of the plaintiff's claim. As the Appellate Court correctly acknowledged, "[t]he general rule with respect to compliance with contract terms . . . is not one of strict compliance, but substantial compliance." (Internal quotation marks omitted.) *Pack 2000, Inc.* v. *Cushman,*

supra, 126 Conn. App. 348–49; accord *ED Construction, Inc.* v. *CNA Ins. Co.*, 130 Conn. App. 391, 410, 24 A.3d 1 (2011); 15 R. Lord, Williston on Contracts (4th Ed. 2000) § 44:52, p. 217. "The doctrine of substantial compliance is closely intertwined with the doctrine of substantial performance." *Pack 2000, Inc.* v. *Cushman*, supra, 349. "The doctrine of substantial performance shields contracting parties from the harsh effects of being held to the letter of their agreements. Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." (Internal quotation marks omitted.) Id.; accord *Clem Martone Construction, LLC* v. *DePino*, 145 Conn. App. 316, 336, 77 A.3d 760, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013); 15 R. Lord, supra, § 44:52, pp. 221–22.

As this court recently has observed, an option to purchase, like the one at issue in the present case, operates as "a continuing offer to sell, irrevocable until the expiration of the time period fixed by agreement of the parties, which creates in the option holder the power to form a binding contract by accepting the offer." (Internal quotation marks omitted.) *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 409, 973 A.2d 1229 (2009); see also *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.*, 148 Conn. 21, 25, 166 A.2d 710 (1960) (tenant's exercise of purchase option in lease resulted in "a binding bilateral contract . . . obligat[ing] [the landlord] to convey title by good and sufficient deed and obligat[ing] [the tenant] to accept the deed and pay the purchase price"). "It is widely accepted that, upon exercise of the option, the lease is extinguished, and the relationship of landlord and tenant becomes that of vendor and vendee." *Bayer* v. *Showmotion, Inc.*, supra, 414. Furthermore, in light of this change in the parties' relationship following the lessee's timely exercise of the option, "[the lessors cannot] rely on alleged breaches occurring after [the lessee's] exercise as grounds for forfeiture." *Summa Corp.* v. *Richardson*, 93 Nev. 228, 235, 564 P.2d 181 (1977).

With respect to the actual exercise of the option, "[t]o be effective, an acceptance of an offer under an option contract must be unequivocal, unconditional, and in exact accord with the terms of the option. . . . If an option contract provides for payment of all or a portion of the purchase price in order to exercise the option, the optionee . . . must not only accept the offer but pay or tender the agreed amount within the prescribed time." (Internal quotation marks omitted.) *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 409. "[I]n order to determine whether the [plaintiff] formed a binding contract with [the defendant] by exercising its option to purchase the property, we . . . review the

terms of the [applicable agreements] to determine whether the [plaintiff's exercise] was unequivocal, unconditional, and in exact accord with the terms of the [applicable agreements]." (Internal quotation marks omitted.) Id. "Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in the light of the circumstances surrounding the execution of the instrument."[8] *Brauer* v. *Freccia*, supra, 159 Conn. 293.

With these principles in mind, we now address the plaintiff's claim that the Appellate Court, in reversing the judgments of the trial court, improperly concluded that the plaintiff had forfeited its right to exercise the options because it did not comply strictly with the lease provisions, a conclusion that, in the Appellate Court's view, was "implicitly" mandated by our decision in *Brauer. Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 347. Because the Appellate Court's reliance on *Brauer* is misplaced, we turn first to an examination of that case.

In *Brauer*, the trial court denied the lessees' request for specific performance of an option predicated on its finding that the lessees were seven months in arrears on their rental payments when they sought to exercise the option; see *Brauer* v. *Freccia*, supra, 159 Conn. 292–93; and because the option was expressly conditioned on the lessees having "duly and punctually fulfilled all the provisions, agreements, covenants and conditions of [the] lease." (Internal quotation marks omitted.) Id., 293. Although the lessees subsequently attempted to tender payment in full after seeking to invoke the option provision of the lease; see id., 292; the trial court concluded "that the payment of all rent due under the lease was a condition precedent to the [lessees'] right to exercise the option to purchase; that the conduct of the [lessor in failing to terminate the lease for nonpayment of rent] did not constitute a waiver of [his] rights and did not estop [him] from relying on the provision of the option [that] required prompt payment of the rent; that the failure to pay the rent for [seven] months . . . was due to gross negligence; that the failure to pay rent when due was not the result of accident, mistake or illness; and that the [lessees] were not entitled to equitable relief." Id., 292–93.

In affirming the judgment of the trial court, this court stated that the option "clearly indicate[d] that the [lessor's] duty to comply with the terms of the option was conditioned [on] the [lessees'] punctual performance of their obligations under the lease. A tenant who fails to meet the named conditions of [a] lease defeats his right to rely on it when he makes an effort to purchase the property pursuant to the option in the lease." Id.,

293–94. This court specifically characterized the language imposing the punctuality requirement as "lucid and unambiguous . . . ." Id., 293. This court therefore concluded that the trial court correctly had determined that, "since the [lessees] had failed to perform their obligations under the lease, the right to enforce the option to purchase was not in existence and the [lessor was] under no obligation to convey the property." Id., 294.

In *Brauer*, it is apparent that the lessees' breaches were material: they were seven months in arrears on rent at the time they sought to exercise the option, which, under the terms of the lease, was expressly conditioned on the prompt payment of rent. Contrary to the determination of the Appellate Court in the present case, however, there is nothing in *Brauer* to suggest that a *nonmaterial* breach of the lease also would have defeated the option rights of the lessees in that case.[9] Although we had no occasion to address that issue in *Brauer* because the lessees' breach in *Brauer* was material by any objectively reasonable standard, courts that have addressed the issue uniformly have concluded that a nonmaterial breach of a lease does not extinguish a lessee's rights under a purchase option provision. See, e.g., *Bachorz* v. *Miller-Forslund*, 703 F.3d 27, 35 (1st Cir. 2012) ("minor, immaterial or inconsequential breaches, which do not prejudice the lessor, will not prevent a lessee from exercising an option" [internal quotation marks omitted]); *Trinity Realty I, LLC* v. *Chazumba, LLC*, 77 Mass. App. 911, 912, 931 N.E.2d 510 (2010) (lessee's substantial compliance with lease terms rendered lessee's performance under lease adequate to maintain its right to exercise option); *Panhandle Rehabilitation Center, Inc.* v. *Larson*, 205 Neb. 605, 610–11, 288 N.W.2d 743 (1980) (lessee was entitled to specific performance of option when lessee substantially performed all obligations under lease); *Cimina* v. *Bronich*, 517 Pa. 378, 386–87, 537 A.2d 1355 (1988) (lessee's failure to pay real estate taxes, although technical breach of lease agreement, was immaterial and did not bar lessee from exercising purchase option); *Rowe* v. *Dorman*, Texas Court of Appeals, Docket No. 06-12-00024-CV (Tex. App. October 18, 2012) (lessee's overall performance of its obligations under lease was sufficient to defeat lessor's claim that lessee's failure to make, inter alia, certain rental and tax payments in timely manner foreclosed lessee from exercising purchase option under lease). In fact, the defendant has not identified a single case, and our research has not revealed one, in which a court has applied a more stringent standard of compliance for the purpose of determining whether a lessee had forfeited his right to exercise a lease purchase option. We conclude, therefore, that, when an option is conditioned on a lessee's compliance with a lease, in the absence of explicit contractual language to the contrary, a substantial rather than strict compliance

standard applies so that, if the lessee is not in material breach of the lease when he seeks to exercise the option and has not previously been defaulted under the terms of the lease, the option is enforceable against the lessor.[10]

In reaching its determination to the contrary, the Appellate Court mistakenly relied on the general principle that an option must be *exercised* in strict accordance with its terms. See *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 349 ("strict compliance is now the rule in many American jurisdictions"). This principle, however, applies solely to the lessee's acceptance or "exercise" of an option. "The 'exercise' of an option is merely the election of the optionee to purchase the property. By the use of the word 'accept' in a particular option contract, the parties mean the same as 'exercising' the option." (Footnote omitted.) 92 C.J.S. 143, Vendor and Purchaser § 171 (2010). "An option does not constitute a sale or a contract to sell, and it cannot be enforced as a contract by either party thereto until it is exercised by acceptance of the offer." (Footnote omitted.) Id., pp. 143–44. The election to exercise an option must be made in the way and manner prescribed by law or specified in the option contract or in the form provided by its terms." (Footnotes omitted.) Id., p. 144. Thus, the cases on which the Appellate Court relied to support its conclusion that the trial court improperly had applied a standard of substantial rather than strict compliance are inapposite because they all involved the application of the rule of strict compliance when the lessee failed to exercise the purchase option in the manner prescribed by the option.[11] See, e.g., *LeBaron Homes, Inc.* v. *Pontiac Housing Fund, Inc.*, 319 Mich. 310, 314–15, 29 N.W.2d 704 (1947) (no evidence that lessee tendered payment as required by option); *Raanan* v. *Tom's Triangle, Inc.*, 303 App. Div. 2d 668, 669, 758 N.Y.S.2d 343 (2003) ("the [lessees] did not comply with the option agreement, as extended, having neither executed the agreed-upon contract of sale, nor tendered the down payment specified therein"); *Zeidman* v. *Davis*, 161 Tex. 496, 499, 342 S.W.2d 555 (1961) (lessee failed to exercise option within time prescribed in agreement). As another court has explained, and as our own case law makes clear, "cases and authorities [that] suggest vigorous compliance with the requirements of option conditions . . . tend to deal with flaws in the exercise of an option, e.g., failure to give notice of the exercise of an option on time, *Donovan Motor Car Co.* v. *Niles*, 246 Mass. 106, 107 [140 N.E. 304] (1923); failure to offer the purchase price on exercise of an option, *Hunt* v. *Bassett*, 269 Mass. 298, 302–303 [168 N.E. 783] (1929); [or] failure to give written notice and furnish [a] cashier's check, *Epton* v. *CBC Corp.*, 48 Ill. App. 2d 274, [280–87, 197 N.E.2d 727] (1964)." *Westinghouse Broadcasting Co.* v. *New England Patriots Football Club, Inc.*, 10 Mass. App. 70, 73–74, 406 N.E.2d 399

(1980); see also *Smith* v. *Hevro Realty Corp.*, 199 Conn. 330, 338–40, 507 A.2d 980 (1986) (exercise of option was ineffective when lessee failed to tender payment at time of exercise as required by option); *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 145 Conn. App. 696, 704–705, 77 A.3d 165 (lessee was not entitled to specific performance of option to purchase when it had not tendered payment in accordance with terms of lease agreement), cert. granted, 310 Conn. 940, 79 A.3d 892 (2013). Because, in the present case, the defendant does not claim that the plaintiff failed to exercise the purchase options in accordance with the terms of the parties' agreements, the Appellate Court's reliance on case law addressing that situation was misplaced.[12]

The defendant finally contends that, even if a substantial compliance standard applied to the plaintiff's performance under the parties' agreements, the trial court incorrectly concluded that the plaintiff had substantially complied with those agreements. Whether a party to a contract substantially performs its obligations thereunder is ordinarily a question of fact to be determined by the fact finder. See, e.g., *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 472, 542 A.2d 692 (1988). Of course, it is not the function of this court to second-guess the reasonable factual findings of the trial court; rather, we must accept those findings unless they are clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 829, 43 A.3d 607 (2012). "[W]hat constitutes full performance generally depends [on] the construction of the contract in light of surrounding circumstances." 17A Am. Jur. 2d 569, Contracts § 611 (2004). "An important factor [is] whether the deviation . . . defeated the contract's purpose . . . ." Id., § 619, p. 577. "Substantial performance occurs when, although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, [the defendant] has received substantially the benefit he expected, and is, therefore, bound to [perform]." (Internal quotation marks omitted.) *Western Distributing Co.* v. *Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Applying these principles to the present case, we conclude that the trial court's finding that the plaintiff substantially complied with the parties' agreements is supported by the record. As the trial court found, and the defendant does not dispute, the defendant has received and continues to receive the full economic benefit of his bargain with the plaintiff. Furthermore, the defendant did not inform the plaintiff that its late

payments constituted a default under the lease agreements until after the plaintiff sought to exercise its options. It bears emphasis, moreover, that none of the parties' agreements specifies a payment date for any of the plaintiff's financial obligations except for the payment of rent, which is due on the first of the month, and payment on the promissory notes, which is due on the eighth of the month. With respect to all other obligations, however, the management agreement simply provides that "[the plaintiff] agrees to . . . [pay] all accounts including, but not limited to . . . utilities, payroll, insurance, franchise fees and royalties, trade accounts, real estate and personal property taxes, and maintenance of all equipment, facilities, furniture, fixtures and improvements." There is no evidence that the plaintiff was not in full compliance with all of its financial obligations to the defendant as of August 22, 2003, the date on which the plaintiff effectively exercised the options to purchase the properties. Indeed, with respect to the litany of late payments identified in some detail by the Appellate Court, most are payments that occurred *after* August 22, 2003. See *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 343–44. Although two categories of late payments, namely, health insurance and equipment leases, occurred during periods that include August, 2003, there is no finding by the trial court that any such payment was outstanding on August 22, 2003, and the defendant makes no such claim.

In an attempt to demonstrate that the trial court reasonably could not have concluded that the plaintiff was in substantial compliance with the terms of the parties' agreements, the defendant refers to a number of tardy utility, insurance and equipment lease payments that the plaintiff tendered prior to its request to exercise the options. The defendant's contention appears to be that, cumulatively, these payments constituted a material breach of the parties' agreements, and that such a breach is inconsistent with a finding of substantial compliance. As we previously indicated, however, the trial court found that the late payments "were, on the whole, made within in a commercially reasonable time." Moreover, although the defendant undoubtedly found some of those late payments to be frustrating and annoying, there is no evidence that they resulted in any financial loss to the defendant. As the plaintiff notes, most of the payments were for very modest amounts in relation to the significant payments that the defendant received under the agreements.[13]

The defendant's contention that the trial court was required to find that these late payments constituted a substantial and material breach of the parties' agreements, sufficient to justify terminating the plaintiff's purchase options under those agreements, is also difficult to square with the defendant's testimony that he understood and expected that there would be problems

of this nature because all of the billing statements for the plaintiff's business were sent to the defendant's office, even though those statements pertained both to the plaintiff's and the defendant's businesses. According to the defendant, after he received a bill, he would determine the plaintiff's proportionate share and then forward a copy of the bill to the plaintiff for payment. It therefore is hardly surprising, as the defendant testified, that this arrangement resulted in "all kinds of [tele]phone calls back and forth between [the defendant's] organization and [the plaintiff's] organization, [as the parties were] trying to figure out [who was] paying which bill, which responsibility, what adjustments."

It also bears emphasis that the defendant, an experienced attorney, drafted the parties' agreements. It stands to reason that if the defendant had wanted to condition the plaintiff's option rights on the plaintiff's punctual fulfillment of some or all of the terms of the agreements, he readily could have incorporated such a provision into the agreements. See *Brauer* v. *Freccia*, supra, 159 Conn. 293–94 (lessor was bound under lease option clause only "if the [l]essees shall have duly and punctually fulfilled all the provisions, agreements, covenants and conditions of [the] lease" [internal quotation marks omitted]). As it stands, however, the agreements do not even specify a payment date for the plaintiff's secondary obligations, which constitute the bulk of the payments at issue. The agreements also do not contain a provision stating that time is of the essence with respect to any payment. It is well settled that, "[when] a time for performance is stated in an agreement, a party's tender of performance within a reasonable time thereafter will be considered substantial performance unless the parties intended that time for performance be of the essence. See J. Calamari & J. Perillo, [The Law of] Contracts (2d Ed. [1977]) § 11-22, pp. 409–10. [When] the agreement does not specifically state that time is of the essence, it is presumed not to be unless the parties have expressed a contrary intent." *Mihalyak* v. *Mihalyak*, 11 Conn. App. 610, 616, 529 A.2d 213 (1987). Courts have applied this rule to a lessee's performance under a lease when a lessor claimed that untimely payments terminated the lessee's right to exercise an option. See, e.g., *Robinson* v. *Cline*, 255 Ark. 571, 574, 501 S.W.2d 244 (1973) (lessee did not lose right to enforce option to purchase on basis of failure to tender timely rental payments when there was no provision in lease for forfeiture based on untimely payments and no "time is of the essence" clause in lease [internal quotation marks omitted]); *Continental Oil Co.* v. *McNair Realty Co.*, 137 Mont. 410, 427, 353 P.2d 100 (1960) ("[when] a lease with [an] option to purchase [did] not state that time [was] of the essence, [the] failure of the optionee to perform the covenants strictly at the time they may or should be performed [did] not cause him to lose his right to specific performance of

the option"). The fact that the parties' agreements in the present case do not specify that time is of the essence, or provide a payment date for the plaintiff's myriad secondary financial obligations, reinforces the trial court's finding that the late payments at issue did not materially impair the rights that the defendant bargained for when he and the plaintiff entered into the agreements.

## II

We next address the defendant's claim that the Appellate Court's judgment should be affirmed on the alternative ground that the plaintiff failed to establish that it was financially able to purchase the realty when it sought to exercise the options, and, as a result, the plaintiff failed to establish entitlement to specific performance of the options. In support of this claim, the defendant relies on the principle that a buyer seeking specific performance of a contract for the sale of real property must demonstrate his or her financial ability to purchase the property, even if the seller has repudiated the contract without justification. See, e.g., *Steiner* v. *Bran Park Associates*, 216 Conn. 419, 423, 582 A.2d 173 (1990) ("A buyer seeking specific performance must prove that he was ready, willing and able to purchase the property. . . . A buyer must prove his financial ability to go forward even when a seller entirely refuses to participate in a closing." [Citations omitted; internal quotation marks omitted.]). The defendant further contends that the trial court's finding that the plaintiff was ready, willing and able to make those purchases on August 22, 2003, was clearly erroneous, first, because there is no evidence of the plaintiff's financial condition at the time it sought to exercise the options and no evidence demonstrating that the plaintiff had obtained the necessary financing, and, second, because there is nothing in the record to indicate how much the plaintiff would have had available to pay for the realty. We disagree with the defendant.

The following facts and procedural history are relevant to our analysis of this issue. On April 2, 2009, the Appellate Court directed the trial court to articulate, inter alia, whether the court found that the plaintiff had established that it was ready, willing and able to purchase the properties when it sought to do so in August, 2003.[14] In its articulation, the trial court first noted that the defendant claimed that the plaintiff was required to present evidence of a mortgage commitment in order to demonstrate that it was financially able to complete the purchases. Relying on *Romaniello* v. *Pensiero*, 21 Conn. App. 57, 61, 571 A.2d 145 (1990), the trial court concluded that, although proof of a mortgage commitment may be necessary in some cases, it is unnecessary when, as in the present case, the lessor has refused to convey the property after a lessee's valid exercise of an option to purchase. In such circum-

stances, the court concluded, the lessee need only prove by a preponderance of the evidence that it "could have obtained a mortgage commitment" when it sought to exercise the option. (Internal quotation marks omitted.) The trial court further concluded that, although "[the] plaintiff did not present specific evidence at trial regarding its financial situation at the time it sought to exercise the options, the surrounding circumstances fully support[ed] the conclusion that [the] plaintiff could have procured a mortgage commitment at that time."

In support of this conclusion, that trial court noted that, at the time of trial, the properties at issue had produced income sufficient to enable the plaintiff to pay the defendant in excess of $1.3 million under the lease and promissory notes. The trial court also credited the testimony of the plaintiff's vice president, Anderson, that the plaintiff "always was ready" to close, that a loan was "all set up" when the plaintiff sought to exercise the options, and that the only thing the plaintiff needed to finalize the loan was the defendant's cooperation in procuring the appraisals. As further evidence of the plaintiff's sound financial condition during the relevant time frame, the trial court also relied on the fact that the plaintiff had successfully purchased a similar property from the defendant in March, 2005. Finally, the trial court observed that the defendant had presented "[no] evidence that [the] plaintiff was in a compromised financial position at the time it sought to exercise the options . . . . [The] defendant's evidence of [the] plaintiff's purported inability to procure credit was limited to evidence of [the] plaintiff's late payments to [the] defendant, which appear to the court to have been caused by administrative inefficiency as opposed to financial insolvency." In addition to the foregoing findings, there was uncontroverted testimony that, at the time of trial, the plaintiff was operating twenty-two Midas shops in seven different states and had successfully purchased thirty-two Midas shops since 1991. Because this evidence was sufficient to support the trial court's finding that the plaintiff was ready, willing and able to purchase the properties, we will not disturb that finding. See *Steiner* v. *Bran Park Associates*, supra, 216 Conn. 423–24 ("Whether a buyer [seeking specific performance of a contract to purchase real estate] has the requisite financial ability [to go forward with the purchase of the property] is a question of fact. . . . A trial court's finding of [financial] inability, which involves a factual issue, will not be reversed unless it is clearly erroneous." [Citations omitted; internal quotation marks omitted.]).

In support of his claim that the trial court's finding with respect to the plaintiff's financial ability was clearly erroneous, the plaintiff relies on this court's statement in *Frumento* v. *Mezzanotte*, 192 Conn. 606, 473 A.2d 1193 (1984), that, "when a purchaser of land is left to depend [on] a purchase price loan from a third

party who is in no way bound to furnish such funds, the purchaser cannot be considered to be able to perform so as to be entitled to specific performance." Id., 617. In a later case, however, we clarified that *Frumento* "did not hold that in every case a buyer must have a written commitment from a financial backer"; (emphasis omitted) *Steiner* v. *Bran Park Associates*, supra, 216 Conn. 425; rather, "what constitutes [financial] ability is a question of fact *to be determined in light of the circumstances of the particular case.*" (Emphasis added; internal quotation marks omitted.) Id., 424.

The facts of *Frumento* are readily distinguishable from the present case. In *Frumento*, a prospective buyer brought an action for specific performance of a contract to purchase real property after the prospective seller refused to sell. *Frumento* v. *Mezzanotte*, supra, 192 Conn. 610. The trial court concluded that the buyer was not entitled to specific performance because he failed to establish that he was financially able to tender the purchase price of $35,000. See id., 610–11. In affirming the trial court's judgment, this court noted that the only evidence that the buyer presented to establish his financial wherewithal to complete the purchase were two bank statements indicating balances that were nowhere near sufficient to cover the purchase price, and "his own testimony regarding his ability to secure a loan from his parents. [The buyer] offered no evidence of any promise or commitment by his parents to make any loan." Id., 616. "He further testified that he had no commitment from a bank to lend him money, and that he was to tender cash at the closing." Id., 615. In light of these facts, this court concluded that the trial court's finding that the buyer had not sustained his burden of proving that he was ready, willing and able to purchase the subject property was not clearly erroneous. Id., 618.

In contrast to *Frumento*, there was ample evidence in the present case from which the trial court reasonably could find that the plaintiff was financially able to complete the purchase. That evidence included that the plaintiff already had paid the defendant in excess of $1.3 million, the plaintiff was financially able to purchase a similar property from the defendant in 2005, and the plaintiff already owned twenty-two other Midas shops. In light of this evidence and Anderson's testimony that the only impediment to finalizing a loan in August, 2003, was the defendant's refusal to cooperate in the procurement of the appraisals, it was reasonable for the trial court to find that the plaintiff would have been able to obtain whatever financing it may have needed to complete the purchase if the defendant had not repudiated the plaintiff's right to purchase the properties in the first place. Cf. *Romaniello* v. *Pensiero*, supra, 21 Conn. App. 61 ("Although a plaintiff seeking specific performance of a sales contract must prove that he was ready, willing and able to effectuate the sale, he need not make a formal tender of the purchase price in the

event that the [seller] breaches the contract. . . . The law does not require a party to proceed with preparations for performance if such preparations would be futile. . . . Here, the [buyer] was not required to . . . seek a mortgage commitment before a sales contract had been prepared. Such acts, in light of the [sellers'] refusal to perform, would indeed have been futile, since mortgage commitments are based on particular values at particular points in time and are not valid indefinitely. [It was sufficient that] [t]he [buyer] proved to the satisfaction of the [trial] referee that he could have obtained a mortgage commitment at any time . . . ." [Citations omitted; emphasis omitted.]). Accordingly, we reject the defendant's contention that the evidence was insufficient to support the trial court's finding that the plaintiff was ready, willing and able to effectuate the purchase of the properties when the plaintiff sought to exercise its purchase options.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgments of the trial court.

In this opinion ROGERS, C. J., and NORCOTT, EVELEIGH, McDONALD and VERTEFEUILLE, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] The plaintiff brought separate actions seeking specific performance of the options with respect to each of the two shops.

[2] ARCO was not named as a defendant in the present actions and, consequently, is not a party to this appeal.

[3] One of the shops is located in the city of New London and the other is located in the town of Groton.

[4] The trial court stated that "[t]his decision renders moot the issue of whether the [plaintiff's] subsequent exercise of the options on May 16, 2006, and May 19, 2006, [was], in fact, valid, particularly in view of [the defendant's] letter dated September 2, 2003 . . . declar[ing] [the] plaintiff out of compliance with the management agreement. Given the court's finding that the plaintiff was in substantial compliance with the agreements [at the time of the first exercise], the court finds that [the] plaintiff's subsequent exercise of its options was effective."

[5] The defendant thereafter filed a motion to open the judgments and for reconsideration, which the trial court denied.

[6] Having concluded that the defendant was entitled to judgments as a matter of law upon application of the strict compliance standard, the Appellate Court did not reach the defendant's additional claims that, (1) even if a substantial compliance standard applied, the trial court's finding that the plaintiff substantially complied with the terms of the agreements was clearly erroneous, and (2) the trial court incorrectly concluded that the plaintiff was entitled to specific performance of the options because the plaintiff failed to prove that it was financially able to purchase the property when it sought to do so. See *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 341 n.1.

[7] The defendant does not dispute that, in accordance with the parties' agreements, the plaintiff's request to exercise the options was timely and in writing.

[8] With respect to the applicable standard of review, the scope of that review "depends [on] the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Cavanaugh* v. *Newtown Bridle Lands Assn., Inc.*, 261 Conn. 464, 470, 803 A.2d 305 (2002).

[9] In *Brauer*, this court relied primarily on *Lake Shore Country Club* v. *Brand*, 339 Ill. 504, 522, 171 N.E. 494 (1930), in support of its determination that the lessees' failure to pay rent for seven months defeated their right to purchase the leased property. See *Brauer* v. *Freccia*, supra, 159 Conn. 294. In *Brand*, the option at issue required the lessee, among other things, to build a clubhouse on the leased property as a condition precedent to the lessee's right to purchase, but the lessee failed to do so. See *Lake Shore Country Club* v. *Brand*, supra, 506–507, 514. In reversing the trial court's judgment granting the lessee specific performance of the option, the Illinois Supreme Court observed that "[a] court of equity cannot relieve the optionee from the effect of his failure to comply with the conditions on which he has been granted the privilege of buying"; id., 522; and, further, because the lessee "was *in default* . . . at the time it gave notice of its election to purchase, it [did] not [meet] the conditions precedent to its right to exercise the option." (Emphasis added.) Id., 524. Clearly, the failure of the lessee in *Brand* to construct the clubhouse constituted a material breach of the parties' agreement.

[10] We note that, even when there has been a material breach of a lease with an option to purchase, courts frequently have held that, if the lease contains a termination provision pursuant to which the lessor is to provide written notice of the default to the lessee and the opportunity to cure— like the default provisions found in the parties' agreements in the present case—the lessor's rights must be read as qualified by that provision, so that the lessor's failure to provide notice of an alleged default precludes the lessor from declaring a forfeiture of the option predicated on that default. See, e.g., *Cinema Development Corp.* v. *Two Thirty Eight Realty Corp.*, 149 App. Div. 2d 648, 649, 540 N.Y.S.2d 305 (1989) (when provision of lease governing default required written notice of default, "notice provision [was] a condition precedent to the landlords' ability to use a default as a reason to deny the [tenant's] rights under the lease, including the [tenant's] option to purchase"); *Rowe* v. *Dorman*, supra, Texas Court of Appeals, Docket No. 06-12-00024-CV (affirming trial court's judgment granting specific performance of option agreement, in part because there was no evidence that lessor provided written notice of default as required by lease); cf. *Entrepreneur, Ltd.* v. *Yasuna*, 498 A.2d 1151, 1165–66 (D.C. 1985) (lessor's notice to lessee of breach was insufficient to extinguish option because notice did not specify nature of breach complained of). We need not address this issue, however, because the present case does not involve a material breach of the terms of the parties' agreements.

[11] The Appellate Court also relied on *Pear* v. *Davenport*, 67 Mass. App. 239, 244–45, 853 N.E.2d 206 (2006), for the proposition that a strict compliance standard applied to the plaintiff's performance under the agreements. See *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 349–50. *Pear* is also inapposite, however, because it involved the issue of whether a lessor's acceptance of rental payments after a material breach constituted a waiver of the lessor's right to terminate the option on the basis of such a breach. See *Pear* v. *Davenport*, supra, 240. In *Pear*, the trial court found that, "[o]ver the term of the lease, the [lessees] were late in paying their rent on no less than fifty occasions. In spite of the tardiness, the [lessors] always accepted the rent and never exercised [the] default option as contained in [the lease]. It was only when the [lessees] exercised their option to purchase that the [lessors] invoked the [default] provisions [and asserted that the lessees had forfeited the option to purchase]." (Internal quotation marks omitted.) Id., 241. On appeal, the lessees claimed that, in light of these facts, the trial court improperly concluded that the lessors did not waive the condition precedent of timely rental payments by accepting all of the lessees' late payments. See id., 240. The Massachusetts Appeals Court rejected this claim, concluding that, although acceptance of rent after a breach generally constitutes a waiver of the right to declare a forfeiture of the lease, "a waiver of the conditions with respect to the tenancy will not be a waiver of the conditions for the option unless the lessor makes a separate waiver of those conditions." Id., 243. *Pear* represents a decidedly minority view on the issue of waiver. Most courts that have considered the issue have concluded that a lessor's acceptance of rental payments after a breach constitutes a waiver of the breach with respect to not only the lease but the option, as well. See, e.g., *Dillingham Commercial Co.* v. *Spears*, 641 P.2d 1, 7–8 (Alaska 1982) ("[a]fter years of accepting late rental payments [the lessor] cannot claim that the default attending such late payment excuses her from performing under the purchase option"); *Robinson* v. *Cline*, 255 Ark. 571, 574–75, 501 S.W.2d 244 (1973) (lessor waived right to declare forfeiture when lessor

accepted late rental payments and never notified lessee of intent to declare forfeiture of option on basis of such payments); *Steven W. Barrick & Associates* v. *Witz*, 147 Ill. App. 3d 615, 619, 498 N.E.2d 738 (1986) ("Under Illinois law . . . waiver principles clearly apply to options . . . . [A] [l]essor's acceptance of rent accruing after a breach, with knowledge of the breach, is a well-established indication of the waiver of the right to forfeit the lease on that ground." [Citation omitted.]); *Okey, Inc.* v. *American National Bank & Trust Co.*, 96 Ill. App. 3d 987, 991, 422 N.E.2d 221 (1981) ("even if prompt payment of rent were construed to be an explicit condition to the exercise of the option . . . waiver of prompt payment of rent could estop [the] lessor from asserting nonpayment as a bar"); *Panhandle Rehabilitation Center, Inc.* v. *Larson*, supra, 205 Neb. 611 ("[when] a party to a [lease option] contract, with knowledge of a breach by the other party, receives money in the performance of the contract, he will be held to have waived such breach" [internal quotation marks omitted]); see also annot., "Lessee's Breach of or Default Under Lease Agreement as Affecting His Right in Respect of Option To Purchase Under the Lease," 53 A.L.R.3d 435, 449, § 8 [a] (1973) (collecting cases and observing that "courts have generally held that the acceptance of rent after the lessee's breach or default in the terms of the lease constituted a waiver of the default so as to entitle the lessee to enforce the option to purchase"). In the present case, although it is undisputed that the defendant accepted all of the plaintiff's late payments while purporting to reserve his rights under the agreements, the trial court did not reach the issue of waiver because of its determination that the plaintiff had substantially complied with the parties' agreements. In this court, the plaintiff raises waiver as an alternative ground for reversing the judgment of the Appellate Court. Because we conclude that the trial court correctly determined that the plaintiff is entitled to specific performance of the options, we, like the trial court, have no reason to address the plaintiff's waiver argument.

[12] We note that the defendant relies on the same case law in arguing that the plaintiff's performance under the parties' agreements was governed by a strict compliance standard. In addition, the Appellate Court relies on 77 Am. Jur. 2d 159, Vendor and Purchaser § 40 (2006), 92 C.J.S., supra, pp. 144–45, and 25 R. Lord, Williston on Contacts (4th Ed. 2002) § 67:84, pp. 499–502, for the proposition that the plaintiff should be deemed to have forfeited its rights under the parties' agreements unless it complied strictly with the terms of those agreements. See *Pack 2000, Inc.* v. *Cushman*, supra, 126 Conn. App. 350. These authorities, however, merely recite the general principle that an option must be exercised in strict accordance with the terms governing its exercise.

The dissenting justice contends that, because "[o]ption contracts are a type of unilateral contract," the general rule of contract interpretation applicable to such contracts, namely, that they are to be construed strictly against the optionee, should apply in the present case. We disagree. As the dissenting justice acknowledges, to the extent that this rule of strict construction applies to unilateral contracts, it does so because a hallmark of such contracts is the fact that there is "no mutuality of obligation between the parties. See [e.g.] 1 E. Farnsworth, [Farnsworth on] Contracts (1990) § 3.24 [pp. 290–91] . . . ." (Citations omitted; internal quotation marks omitted.) In the present case, however, the parties' option agreement is not "a simple unilateral contract of option"; *Williams* v. *Lilley*, 67 Conn. 50, 56, 34 A. 765 (1895); rather, the option agreement is but one component of the parties' *bilateral* lease and management agreements. This court long has acknowledged this distinction. See, e.g., id. In recognition of this distinction, courts construe the option provision no differently from the remainder of the bilateral contract, except with respect to the requirements of the option provision that pertain solely to the option, namely, the requirements governing the exercise of the option. To conclude otherwise would deprive the lessee of his bargained for option rights solely on the basis of his failure to comply strictly with wholly trivial and immaterial terms of the lease. As the Massachusetts Appeals Court recently observed, minor, immaterial or inconsequential breaches that do not prejudice the lessor will not preclude a lessee from exercising a purchase option; otherwise, "[an] option would be virtually meaningless, as [the lessor] could seize on any number of trivial, technical violations of the lease in order to avoid it." *Trinity Realty I, LLC* v. *Chazumba, LLC*, supra, 77 Mass. App. 912. The dissenting justice has identified no reason to deviate from this general rule, and we know of none.

[13] For example, one such late payment that was particularly upsetting to the defendant was a late payment to the telephone company in the amount

of $217.09.

[14] The Appellate Court also directed the trial court to articulate whether it had considered the doctrine of unclean hands. That issue is not before us.